**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Alfredo Lucero Garcia,

                Petitioner,

v.

David Shinn, et al.,

                Respondents.

No. CV-15-00025-PHX-DGC

<u>DEATH PENALTY CASE</u>

**ORDER**

Before the Court is the petition for writ of habeas corpus filed by Alfredo Lucero Garcia, an Arizona death row prisoner. (Doc. 22.) Respondents filed an answer opposing the petition. (Doc. 29.) For the reasons set forth below, the petition is denied.

## I. BACKGROUND

On the afternoon of May 21, 2002, Garcia and co-defendant James Sheffield robbed a bar called Harley's 155 Club ("Harley's") in Phoenix. During the robbery, the bar's owner, Steven Johnson, was shot to death. In 2007 a Maricopa County jury convicted Garcia of armed robbery and first-degree murder. He was sentenced to death on the murder count. The Arizona Supreme Court, in its opinion affirming Garcia's conviction and sentence, discussed the circumstances surrounding the murder. *State v. Garcia*, 224 Ariz. 1, 7, 226 P.3d 370, 376 (2010).

Daniel Anderson was tending bar at Harley's when Garcia entered and asked to use the restroom. Anderson and Johnson directed him to the rear of the bar. Shortly thereafter, Johnson went to the back of the bar to work on a broken ATM. He was kneeling beside

the machine with a stack of $20 bills when Garcia burst through the back door shouting "drop the money."  Sheffield was directly behind Garcia, carrying a gun.  Johnson stood, threw the $20 bills to the ground, and said "just get out, get out of here."  Garcia pushed him against the wall.

Anderson ran to the bar's office, pushed an alarm button, and escaped.  He heard a gunshot before entering the office and sounds of a struggle and a second gunshot as he fled.

Anderson went to another bar and called the police.  When they arrived at Harley's, they found Johnson's body outside the back door with $20 bills scattered nearby.  Police also viewed video recordings from bus security cameras that showed Garcia and Sheffield boarding a bus near the crime scene and later getting off at the same stop.  The investigation led to Garcia's arrest on June 1, 2002, and Sheffield's arrest on June 6.

Garcia and Sheffield were each indicted on one count of first-degree murder and one count of armed robbery.  Their trials were severed.  A jury found Garcia guilty on both counts.  After learning of possible juror misconduct, the trial court empaneled a new jury for the aggravation and penalty phases of trial.

During the aggravation phase, the second jury found that Garcia was a major participant in the felony and was recklessly indifferent to Johnson's life.[1]  The jury also found two aggravating factors: Garcia had previously been convicted of a serious offense, *see* A.R.S. § 13–751(F)(2), and he committed the murder for pecuniary gain, *see* § 13–751(F)(5).  The jury concluded that the mitigating circumstances were not sufficiently substantial to call for leniency and determined that Garcia should be sentenced to death.  The Arizona Supreme Court affirmed.  *Garcia*, 224 Ariz. 1, 226 P.3d 370.

Garcia filed a petition for post-conviction relief ("PCR"), which the state court denied.  The Arizona Supreme Court denied review.

---

[1] As discussed in more detail below, under *Tison v. Arizona*, 481 U.S. 137 (1987), and *Enmund v. Florida*, 458 U.S. 782 (1982), a defendant convicted of felony murder can be sentenced to death only if he actually killed, attempted to kill, or intended to kill, or if he was a major participant in the underlying felony and acted with reckless indifference to human life.

- 2 -

## II.    APPLICABLE LAW

Federal habeas claims are analyzed under the framework of the Antiterrorism and Effective Death Penalty Act ("AEDPA").[2]  Pursuant to AEDPA, a petitioner is not entitled to habeas relief on any claim adjudicated on the merits in state court unless the state court's adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly-established federal law, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly-established federal law under § 2254(d)(1) if the decision applies a rule that contradicts the governing law set forth in Supreme Court precedent, reaching a conclusion on a matter of law opposite that reached by the Supreme Court, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result.  *Williams (Terry) v. Taylor*, 529 U.S. 362, 405–06 (2000); *see, e.g.*, *Hooper v. Shinn*, 985 F.3d 594, 614 (9th Cir. 2021).  Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Id.* at 407; *see, e.g.*, *Murray v. Schriro*, 745 F.3d 984, 997 (9th Cir. 2014).

"Clearly-established federal law" refers to the holdings, as opposed to dicta, of the Supreme Court's decisions at the time of the relevant state court decision.  *Id.* at 412.

---

[2]  Garcia's challenges to the constitutionality of AEDPA based on suspension and separation of powers (Doc. 22 at 43–45) have been rejected by the Ninth Circuit. *See Crater v. Galaza*, 491 F.3d 1119, 1125–26 (9th Cir. 2007) (holding that AEDPA violates neither the Suspension Clause nor the separation of powers doctrine).

1   "[C]ircuit precedent does not constitute 'clearly established Federal law'" and "cannot

2   form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 567 U.S. 37, 48–49

3   (2012); *see Carey v. Musladin*, 549 U.S. 70, 76–77 (2006).   A reviewing court may,

4   however, "look to circuit precedent to ascertain whether it has already held that the

5   particular point in issue is clearly established by Supreme Court precedent." *Marshall v.*

6   *Rodgers*, 569 U.S. 58, 64 (2013).

7        The Supreme Court has emphasized that "an *unreasonable* application of federal

8   law is different from an *incorrect* application of federal law." *Id.*   For a state court's

9   decision to be an unreasonable application of clearly-established federal law, "the ruling

10  must be 'objectively unreasonable, not merely wrong; even clear error will not suffice.'"

11  *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (quoting *Woods v. Donald*, 575 U.S.

12  312, 316 (2015) (per curiam)); *see Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020); *Bolin v.*

13  *Davis*, 13 F.4th 797, 805 (9th Cir. 2021).   The burden is on the petitioner to show "there

14  was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S.

15  86, 98 (2011).   This standard is meant to be "difficult to meet." *Kayer*, 141 S. Ct. at 523

16  (quoting *Richter*, 562 U.S. at 102).

17       Under § 2254(d)(2), habeas relief is available if the state court decision was based

18  on an unreasonable determination of the facts.   *See Miller-El v. Dretke* (*Miller-El II*), 545

19  U.S. 231, 240 (2005).   "[A] decision adjudicated on the merits in a state court and based

20  on a factual determination will not be overturned on factual grounds unless objectively

21  unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*

22  *v. Cockrell* (*Miller-El I*), 537 U.S. 322, 340 (2003).   A state court's factual determination

23  is presumed correct and a petitioner bears the burden of overcoming that presumption with

24  clear and convincing evidence.   28 U.S.C. § 2254(e)(1); *see Miller-El I*, 537 U.S. at 340.

25  A state court's "factual determination is not unreasonable merely because [a] federal

26  habeas court would have reached a different conclusion in the first instance." *Wood v.*

27  *Allen*, 558 U.S. 290, 301 (2010); *see Brumfield v. Cain*, 576 U.S. 305, 314 (2015)

28  (explaining that § 2254(d)(2) requires federal courts to "accord the state trial court

1   substantial deference"); *Walden v. Shinn*, 990 F.3d 1183, 1195–96 (9th Cir. 2021).

2          For claims not adjudicated on the merits in state court, federal review is generally

3   not available when the claims have been denied pursuant to an independent and adequate

4   state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In Arizona, there

5   are two avenues for petitioners to exhaust federal constitutional claims: direct appeal and

6   PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR

7   proceedings and provides that a petitioner is precluded from relief on any claim that could

8   have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). For

9   unexhausted and defaulted claims, federal habeas is barred unless the petitioner can

10  demonstrate cause for the default and actual prejudice as a result of the alleged violation

11  or show that failure to consider the claim will result in a fundamental miscarriage of justice.

12  *Coleman*, 501 U.S. at 750.

13         *Coleman* held that ineffective assistance of counsel in PCR proceedings did not

14  establish cause for the procedural default of a claim. *Id.* In *Martinez v. Ryan*, 566 U.S. 1,

15  9 (2012), however, the Court established a "narrow exception" to that rule. Under *Martinez*

16  an Arizona petitioner may establish cause and prejudice for the procedural default of an

17  ineffective assistance of trial counsel claim by demonstrating that (1) PCR counsel

18  performed ineffectively by failing to raise the underlying ineffective assistance claim and

19  (2) the underlying claim is substantial or has some merit. *See Cook v. Ryan*, 688 F.3d 598,

20  607 (9th Cir. 2012) (citing *Martinez*, 566 U.S. at 14).

21         The *Martinez* exception applies only to claims of ineffective assistance of trial

22  counsel. It has not been expanded to excuse the default of other types of claims. *Martinez*

23  *(Ernesto) v. Ryan*, 926 F.3d 1215, 1225 (9th Cir. 2019) ("[I]neffective assistance of PCR

24  counsel can constitute cause only to overcome procedurally defaulted claims of ineffective

25  assistance of trial counsel."); *Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015);

26  *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013); *see Davila v. Davis*, 137 S.

27  Ct. 2058, 2062–63, 2065–66 (2017) (holding that the *Martinez* exception does not apply to

28  claims of ineffective assistance of appellate counsel).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.    DISCUSSION

Garcia initially raised 48 claims for relief.  (Doc. 22.)  The Court denied Garcia's request for evidentiary development.  (Doc. 50.)  In doing so the Court denied Claims 1(B), 1(C), 1(D), 2(C), 2(D), 2(H), 4, 15, and 21 as procedurally defaulted and barred from federal review, and Claims 1(A), 2(A), 2(B), and 9(C) as meritless.[3]  (*Id.*)  The Court addresses Garcia's remaining habeas claims as follows.

### Claim 2:

Garcia alleges that counsel performed ineffectively at the guilt phase of trial.  In the remaining subclaims of Claim 2, he argues that counsel performed ineffectively by failing to conduct an adequate guilt-phase investigation, Claim 2(E); failing to subject the State's case to "adversarial testing," Claim 2(F); and failing to make timely objections, Claim 2(G).  (Doc. 22 at 92–101.)  The claims lack merit.

### *Strickland*

Claims of ineffective assistance of counsel are governed by the principles set out in *Strickland*, 466 U.S. 668.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id.* at 686.  To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense.  *Id.* at 687–88.  Unless both showings are made, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."  *Id.* at 687.

---

[3] Claim 1 alleges ineffective assistance of counsel at sentencing.  The claim consists of four subclaims, including Claim 1(A), alleging that trial counsel performed ineffectively by failing to investigate and present readily available mitigation evidence.  (Doc. 22 at 48.) Garcia exhausted Claim 1(A) in state court.  This Court found that the PCR court's denial of the claim satisfied neither § 2254(d)(1) or (2).  (Doc. 50 at 9–16.)

The inquiry under *Strickland* is highly deferential. 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* The "standard is necessarily a general one," *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009), because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant," *Strickland*, 466 U.S. at 688–89.

*Strickland*'s first prong – deficient performance – is established by "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To make this showing, a petitioner must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (quotation omitted). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). "The defendant bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy." *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001) (citing *Strickland*, 466 U.S. at 689). "[T]he relevant inquiry . . . is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Murray*, 745 F.3d at 1011 (quoting *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998)).

Under *Strickland*'s second prong – prejudice – a petitioner must affirmatively "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing

1   *Strickland*, 466 U.S. at 693); *see Hooper*, 985 F.3d at 628.  The petitioner "'bears the highly

2   demanding and heavy burden [of] establishing actual prejudice.'" *Allen v. Woodford*, 395

3   F.3d 979, 1000 (9th Cir. 2005) (quoting *Williams (Terry)*, 529 U.S. at 394).

4       Under AEDPA, claims of ineffective assistance of counsel are subject to two layers

5   of deference.  "Surmounting *Strickland*'s high bar is never an easy task," *Padilla v.*

6   *Kentucky*, 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application of

7   *Strickland* was unreasonable under § 2254(d) is all the more difficult," *Richter*, 562 U.S.

8   at 105; *see Burt v. Titlow*, 571 U.S. 12, 15 (2013) (explaining that under AEDPA, the

9   reviewing court "gives both the state court and the defense attorney the benefit of the

10   doubt"). "When § 2254(d) applies, the question is not whether counsel's actions were

11   reasonable.  The question is whether there is any reasonable argument that counsel satisfied

12   *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.  Therefore, the "only question

13   that matters" under § 2254(d) is whether the state court's decision was "so obviously wrong

14   as to be 'beyond any possibility for fairminded disagreement.'" *Kayer*, 141 S. Ct. at 526

15   (quoting *Richter*, 562 U.S. at 102, 103).

16       Claim 2(E)

17       Garcia alleges that counsel's guilt-phase investigation was insufficient.[4]  He argues

18   that "it was unreasonable for counsel to go to trial without conducting an adequate

19   investigation or consulting experts regarding the crime scene, the police reports and witness

20   testimony, and Garcia's version of what occurred the night Johnson was shot."  (Doc. 22

21   at 93.)  He bases these allegations primarily on the number of hours billed by lead counsel

22   and the trial investigator for pretrial preparation and investigation, such as interviewing

23   witnesses, and the reliance on counsel for Sheffield to conduct most investigative

24   interviews.  (*Id.* at 93–94.)

25

26   _____

27   [4] In its order denying evidentiary development, the Court addressed Garcia's claims that
    counsel performed ineffectively by failing to retain ballistics and DNA experts, Claims

28   2(A) and (B).  The Court found that the PCR court reasonably applied *Strickland* in
    rejecting these claims.  (Doc. 50 at 21–24.)

In his PCR petition, Garcia raised general allegations that trial counsel's guilt phase investigation was inadequate.  (PCR Pet. at 31.)[5]  The PCR court denied the claim as both waived—being undeveloped and factually unsupported—and meritless.  (PCR Ruling at 18–19.)[6]  With respect to the claim's merits, the state court explained:

> decisions concerning trial strategy and tactics, including what witnesses to call, motions to file and objections to make, is entrusted to trial counsel.  *State v. Lee*, 142 Ariz. 210, 689 P.2d 154 (1984).

> "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Strickland*, 466 U.S. at 695.  The evidence disclosed that defendant led co-defendant into the bar, pushed the victim against the bar, shouted "drop the money," pushed the victim against the wall, and was nearby when the victim was shot to death.  *Garcia*, 224 Ariz. at 4, 226 P.3d at 383.  Defendant has not established that there is a reasonable doubt about [his] guilt.

> Counsel's performance was neither deficient nor was it prejudicial.  Defendant has failed to satisfy either prong of *Strickland* as to trial counsel's guilt phase representation.

(*Id.*)

The PCR court's decision was neither contrary to nor an unreasonable application of *Strickland*.  Garcia offers no more support for this claim here than he did in state court.  (*See* Doc. 22 at 92–94.)  His complaint that the PCR court cited *Lee*, "a state case from 1984" (*id.* at 94), is curious, as the Arizona Supreme Court in *Lee* simply affirmed that the *Strickland* standard governs claims of ineffective assistance of counsel.  142 Ariz. at 214, 689 P.2d at 157.  The state court cited *Strickland* as well.  (PCR Ruling at 18–19.)

Garcia makes no attempt to meet his highly demanding burden of affirmatively showing prejudice.  *See Allen*, 395 F.3d at 1000; *Strickland*, 466 U.S. at 693–94.  He asserts that counsel's pretrial investigation could not have been effective given the number of hours billed, but he does not explain what exculpatory evidence would have been revealed if counsel had invested more time or had consulted with "experts regarding the crime scene,

---

[5] *See* Doc. 29-1, Ex. II.

[6] *See* Doc. 29-2, Ex. QQQ

the police reports and witness testimony, and Garcia's version of what occurred."  (Doc. 22 at 93.)  "A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial."  *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989); *see Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation about what an expert could have said is not enough to establish prejudice."); *Hendricks v. Calderon*, 70 F.3d 1032, 1042 (9th Cir. 1995) ("Absent an account of what beneficial evidence investigation into any of these issues would have turned up, Hendricks cannot meet the prejudice prong of the *Strickland* test.").

Claim 2(E) fails to satisfy the doubly deferential standard that governs ineffective assistance claims under AEDPA.  *See Richter*, 562 U.S. at 105; *Titlow*, 571 U.S. at 15.  Claim 2(E) is denied.

Claim 2(F)

Garcia alleges that his defense team did not "subject [his] case to adversarial testing" because counsel failed "to file substantive motions and file objections in response to the State's substantive motions."  (Doc. 22 at 95–96.)  The PCR court rejected this claim, noting that counsel filed substantive motions both before trial and after the guilty verdict, and joined motions filed by co-defendant Sheffield.  (PCR Ruling at 13–16.)  These motions challenged the admissibility of a prior robbery and shooting, the DNA evidence, and the pretrial identification, "all of which bore directly on evidence essential to the State's case."  (*Id.* at 16.)  The court also found that the claims PCR counsel faulted trial counsel for failing to raise did not "undermine[] the guilt determination."  (*Id.*)  The PCR court's decision was neither contrary to nor an unreasonable application of *Strickland*.

Garcia argues primarily that his counsel failed to file various pretrial motions.  Although he lists the general topic of some of these omitted motions (Doc. 22 at 98), he does not explain what the motions should have argued, why the arguments would have had merit, or how the motions would have affected his case.  (*Id.*)  This clearly is insufficient.  "To show prejudice under *Strickland* from failure to file a motion, [a petitioner] must show

that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him." *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 373–74 (1986)).

Garcia argues that he need not "make a specific showing of prejudice" because prejudice is presumed under *United States v. Cronic*, 466 U.S. 648, 659 (1984). (Doc. 22 at 99.)  In *Cronic*, the Supreme Court created an exception to the *Strickland* standard where there is an actual breakdown in the adversarial process at trial.  466 U.S. at 656–58.  When this occurs, the prejudicial impact of counsel's poor performance is presumed and need not be proved.  *Id.* at 659–60.  But *Cronic* is "reserved for situations in which counsel has entirely failed to function as the client's advocate."  *Florida v. Nixon*, 543 U.S. 175, 189 (2004).  This is a "narrow" exception and the presumption is "infrequently" justified.  *Id.* at 190.  For *Cronic* to apply, "the attorney's failure must be complete."  *Bell v. Cone*, 535 U.S. 685, 696–97 (2002); *see United States v. Thomas*, 417 F.3d 1053, 1057 (9th Cir. 2005) (explaining that in *Cone* "the Court emphasized that *Cronic*'s exception for failing to test the prosecution's case applies when the attorney's failure to oppose the prosecution goes to the proceeding as a whole—not when the failure occurs only at specific points in the trial"); *Hovey v. Ayers*, 458 F.3d 892, 906–07 (9th Cir. 2006) ("*Cronic* requires wholesale failure by counsel to defend the client"); *Gallegos v. Ryan*, 820 F.3d 1013, 1034 (9th Cir. 2016) (finding *Cronic* inapplicable where counsel "did not fail entirely to advocate for" defendant).

Garcia's counsel did not fail to oppose the prosecution throughout the proceeding as a whole.  Counsel subjected the State's case to meaningful adversarial testing through motions, cross-examination of the State's witnesses, opening statements and closing arguments, objections to the State's evidence, and presentation of a case in mitigation.  Garcia has not shown that his counsel "entirely" or "completely" failed to test the State's case.  *See Castillo v. Fla., Sec'y of DOC*, 722 F.3d 1281, 1287 (11th Cir. 2013) (finding counsel "did subject the prosecution's case to meaningful adversarial testing, not just on

occasion but throughout the trial" where counsel filed a motion to suppress defendant's confession, questioned venire members and successfully challenged several prospective jurors, gave an opening statement, made numerous objections, moved for a mistrial on several occasions, cross-examined the state's witnesses, and gave a closing argument urging the jury to acquit). Prejudice cannot be presumed under *Cronic*, and Garcia has failed to show that counsel's failure to file various listed motions prejudiced his case.

The PCR court reasonably determined that Garcia was not prejudiced by counsel's failure to file additional motions. Claim 2(F) does not satisfy the doubly deferential that governing ineffective assistance claims under AEDPA. *See Richter*, 562 U.S. at 105; *Titlow*, 571 U.S. at 15.

Claim 2(G)

Garcia alleges that counsel performed ineffectively by "fail[ing] to make timely objections" during the guilt phase of trial. (Doc. 22 at 99.) He specifically refers to counsel's "untimely" objection when the prosecutor used the facts of the case in his questioning of the jurors during voir dire and counsel's failure to object to comments the prosecutor made in his opening statement suggesting the police were afraid of Garcia. (*Id.* at 100–01.) The PCR court rejected these claims. (PCR Ruling at 16–18.)

       *i.*     *Voir dire*

During voir dire of the first jury, the prosecutor asked potential jurors questions based on the *Enmund/Tison* holding; specifically, he asked jurors whether they could impose the death penalty where the victim was killed during a robbery but the defendant was not the actual shooter. (*See* RT 10/11/07 at 7, 14, 26, 39, 70, 72.) In questioning one potential juror the prosecutor elaborated on the scenario by adding that blood evidence showed the defendant, while not the shooter, was in close proximity to the shooting. (*Id.* at 14.)

Defense counsel subsequently moved to prevent the prosecutor from asking case-specific questions. (RT 10/12/07 at 2.) The court suggested that the prosecutor could ask such questions if they were framed as hypotheticals. (*Id.* at 5–7.) Defense counsel agreed.

1    (*Id.* at 6.)    Counsel then objected when the prosecutor referred directly to Garcia in

2    questioning another of the potential jurors.  (RT 10/12/07 at 14.)  The prosecutor thereafter

3    framed his questions as hypotheticals without objection from the defense.  (*See id.* at 50,

4    64; RT 10/16/07 at 8, 17, 118, 123, 160–62; RT 10/17/07 at  6, 47.)

5        In denying relief on this claim, the PCR court first noted that the Arizona Supreme

6    Court held that the trial judge did not abuse his discretion in allowing the State to ask

7    prospective jurors whether they could impose the death penalty even if the defendant was

8    not the shooter.  (PCR Ruling at 16.)  The Arizona Supreme Court explained that "[g]iven

9    the nature of this case, these questions properly probed beyond abstract juror views on

10   capital punishment" and emphasized that "the State never asked jurors to precommit to a

11   specific position; rather, it merely asked jurors if they could *consider* the death penalty in

12   circumstances in which it is permitted under Arizona law."  *Garcia*, 224 Ariz. at 9, 226

13   P.3d at 79.

14       The PCR court also found that Garcia was not prejudiced by counsel's failure to

15   object because there was no indication that the jury was not fair and impartial.  (PCR Ruling

16   at 17.)  This ruling was neither contrary to nor an unreasonable application of *Strickland*,

17   nor was it based on an unreasonable determination of the facts.  First, the Arizona Supreme

18   Court held that the prosecutor's questions were not improper.  Counsel did not perform

19   ineffectively by failing to object to permissible questions.  *See Green v. Johnson*, 160 F.3d

20   1029, 1037 (5th Cir. 1998) ("[F]ailure to make a frivolous objection does not cause

21   counsel's performance to fall below an objective level of reasonableness.").   Second,

22   Garcia does not attempt to show that any juror seated after the prosecutor's questioning

23   was biased against him.  As the Arizona Supreme Court noted, the prosecutor merely asked

24   whether the jurors could *consider* the death penalty in circumstances permitted under

25   Arizona law – the jurors were not asked to make any kind of a commitment.  Garcia "has

26   not made the required showing of prejudice under *Strickland*, because he has not shown

27   that any juror who harbored an actual bias was seated on the jury as a result of counsel's

28   failure" to object to the prosecutor's voir dire questions.  *Ybarra v. McDaniel*, 656 F.3d

984, 1001 (9th Cir. 2011); *see Davis v. Woodford*, 384 F.3d 628, 643 (9th Cir. 2004) ("Establishing *Strickland* prejudice in the context of juror selection requires a showing that, as a result of trial counsel's [error], the jury panel contained at least one juror who was biased.").

ii.     *Opening statement*

Garcia alleges that defense counsel performed ineffectively by failing to object to comments the prosecutor made in his opening statement.  During his discussion of Garcia's capture by the police, the prosecutor stated that:

> Mr. Garcia had been living with his girlfriend at 203 West Broadway and there was—the police at that time were looking for him in connection with this case because they saw that picture.
>
> On that day, he leaves the house and the police have got the place under surveillance.  They see him.  They want to arrest him without any big thing happening.  They don't want to bust into the house.  He leaves the house.  They attempt to arrest him and he runs.
>
> Since the police are afraid of him and know that he's been involved in a dangerous offense, he gets shot and he is wounded.  He recovers.

(RT 10/23/07 at 34.)

The PCR court denied relief on Garcia's claim that counsel performed ineffectively by failing to object to the comments.  (PCR Ruling at 18.)  The court found that the statement was not inappropriate and "may have served to explain the police determination to wait until [Garcia] left his residence before apprehending [him] and why guns were drawn and the defendant was wounded and attempted to flee."  (*Id.*)  The court explained that counsel had objected to several other comments, that it was counsel's role to determine when to object, and that objecting may have had the "unwanted effect of highlighting the objected-to statement."  (*Id.*)  The PCR court also noted that the trial judge instructed the jury that what the lawyers say is not evidence.  (*Id.*)  Based on these factors, the court concluded that defense counsel's performance during opening statements was neither deficient nor prejudicial.  (*Id.*)

1    The PCR court's ruling was neither contrary to nor an unreasonable application of

2  *Strickland*.  First, counsel's strategy with respect to objections is entitled to deference, and

3  reviewing courts "indulge a strong presumption that counsel's conduct falls within the wide

4  range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.  Trial counsel

5  may properly decide to "refrain from objecting during closing argument to all but the most

6  egregious misstatements by opposing counsel on the theory that the jury may construe their

7  objections to be a sign of desperation or hyper-technicality." *United States v. Molina*, 934

8  F.2d 1440, 1448 (9th Cir. 1991).  "[A]bsent egregious misstatements, the failure

9  to object during closing argument and opening statement is within the 'wide range' of

10  permissible professional legal conduct." *United States v. Necoechea*, 986 F.2d 1273, 1281

11  (9th Cir. 1993).  In short, "withholding objections . . . is acceptable defense strategy."

12  *Cunningham v. Wong*, 704 F.3d 1143, 1160 (9th Cir. 2013).

13    As the PCR court found, the prosecutor's comments were not inappropriate.  Rather,

14  they "were a permissible preview of the charges and the evidence to be presented at trial."

15  *United States v. Hoelker*, 765 F.2d 1422, 1426 (9th Cir. 1985).  The trial evidence showed

16  that the police had received a tip that Garcia was staying with his girlfriend.  They

17  surveilled the area and on June 1 observed Garcia leaving his girlfriend's house on a

18  bicycle.  (RT 11/5/07 at 106.)  Police attempted to stop him, but he continued riding past

19  the officers, one of whom then shot him in the back.  (*Id.* at 106–09.)  He was taken into

20  custody.  The officer who shot Garcia testified that he was aware Garcia was wanted for

21  the Harley's murder.  (*Id.* at 109.)  Counsel's decision not to object to the prosecutor's

22  comments, "possibly to avoid highlighting them, was a reasonable strategic decision."

23  *Cunningham*, 704 F.3d at 1159; *see Demirdjian v. Gibson*, 832 F.3d 1060, 1072–73 (9th

24  Cir. 2016).

25    Even if counsel performed deficiently in failing to object, Garcia cannot show

26  prejudice under *Strickland*.  As noted, the prosecutor's comments describing the evidence

27  surrounding Garcia's arrest were not improper.  *See Juan H. v. Allen*, 408 F.3d 1262, 1273

28  (9th Cir. 2005); *Demirdjian*, 832 F.3d at 1073.  In addition, the trial court instructed the

1    jury that "[w]hat is said in opening statements is neither evidence nor argument.  The

2    purpose of an opening statement is to help you prepare for the anticipated evidence."  (RT

3    10/23/07 at 12.)  At the end of the guilt phase, the trial court again reminded the jurors that

4    "[i]n their opening statements and closing arguments, the lawyers have talked to you about

5    the law and the evidence.  What the lawyers said is not evidence but it may help you to

6    understand the law and the evidence."  (RT 11/7/07 at 62.)  Finally, defense counsel cross-

7    examined the officer who shot Garcia about the circumstances of the arrest, eliciting

8    testimony that Garcia did not threaten the officer and the officer did not see any type of

9    weapon on Garcia.  (RT 11/5/07 at 110–22.)  Given these circumstances, Garcia has not

10   shown there was a reasonable probability of a different verdict if he had objected to the

11   prosecutor's comments.  *Cunningham*, 704 F.3d at 1159.  The PCR court reasonably

12   determined that Garcia was not prejudiced by counsel's failure to object to the prosecutor's

13   opening statement.

14          Claim 2(G) does not satisfy the doubly deferential standard governing *Strickland*

15   claims under AEDPA.  *See Richter*, 562 U.S. at 105; *Titlow*, 571 U.S. at 15.

16          **Claim 3:**

17          Garcia alleges that the trial court's refusal to provide the jury with co-defendant

18   Sheffield's plea agreement from another case violated Garcia's rights under the Fifth,

19   Sixth, Eighth, and Fourteenth Amendments.  (Doc. 22 at 103.)  At issue is the plea

20   agreement Sheffield entered into for a liquor-store robbery and murder he committed after

21   Garcia's arrest for the Harley's murder.  During the penalty phase of trial, Garcia argued

22   that the subsequent murder committed solely by Sheffield demonstrated that Garcia was a

23   minor participant in the Harley's murder.  He also argued that the disparate treatment

24   between himself and Sheffield – Garcia, the non-shooter, being charged with the death

25   penalty, while Sheffield, the shooter, received life in prison – mitigated against the death

26   penalty.  (*See* RT 12/18/07 at 4–6, 64–71.)

27          Garcia raised this claim on appeal, alleging violations of his rights under the Fifth,

28   Sixth, and Fourteenth Amendments.  (Doc. 29-1, Ex. B at 1–5.)  The Arizona Supreme

Court denied the claim after setting out the following factual background:

> The record reflects some confusion regarding Exhibit 203.  During the penalty phase, the State introduced two exhibits while cross-examining Garcia's mitigation specialist.  The exhibits, marked as 201 and 203, were presentence reports from Garcia's prior cases.  Both exhibits were used solely for impeachment and neither was admitted.  Later that day, the trial court issued a minute entry renumbering Exhibit 203 as Exhibit 202.  The next day, defense counsel questioned a witness about Sheffield's participation in a murder at a liquor store after Garcia's arrest.  During this testimony, defense counsel introduced a copy of Sheffield's plea agreement for the murder in that case.  The plea agreement was marked as Exhibit 203 and admitted into evidence.

> Less than thirty minutes after it began deliberating, the jury requested Exhibits 201 and 203.  The trial court denied the request, stating that those exhibits had not been admitted.  Neither attorney objected.  The trial court was mistaken, because although the exhibit first marked as 203 (a presentence report) was not admitted, another exhibit (Sheffield's plea agreement) was later numbered Exhibit 203 and admitted.

*Garcia*, 224 Ariz. at 19, 226 P.3d at 388.  One of "Garcia's prior cases" mentioned by the Arizona Supreme Court is Garcia's armed robbery conviction arising from a robbery and shooting he and Sheffield committed at a bar called the RNR Stix about five weeks before the Harley's murder.  *See id.* at 11–12, 226 P.3d at 380–81.

Respondents assert that the jury was in fact provided with Sheffield's plea agreement, which was admitted into evidence as *Defendant's* Exhibit 203.[7]  (Doc. 29 at 104–05, citing RT 12/18/07 at 21–23.)  According to Respondents, the exhibits requested by the jury were State's Exhibits 201 and 203, pre-sentence reports from Garcia's prior offenses which were not admitted into evidence.  (*Id.*, citing RT 12/17/07 at 96, 102, 106; RT 12/18/07 at 86.)  Respondents also note that the jury was provided with Sheffield's sentencing documents in Exhibit 197.  (Doc. 29 at 104, citing RT 12/18/07 at 6–12.)

Regardless of which discussion of Exhibit 203 is correct, Garcia is not entitled to relief on this claim.  As the Arizona Supreme Court explained, the jury in Garcia's trial

---

[7] The court took judicial notice of "defendant's exhibit, State versus Sheffield, CR 2002-009787 in which the State was seeking the death penalty in this case."  (RT 12/18/07 at 21.)

was well aware that Sheffield avoided the death penalty.  Garcia was not prejudiced by the trial court's refusal to submit Sheffield's plea agreement to the jury:

> [Garcia] was able to present ample evidence that Sheffield had committed another murder and had made non-death sentence plea deals for that crime and the RNR Stix incident. Exhibit 197, which detailed Sheffield's sentences for both crimes, was admitted into evidence. Detective Rodriguez[8] testified that Garcia was in custody when Sheffield committed the liquor store murder and that Sheffield took a plea bargain in that case. Garcia told the jury in his closing argument that the State had "dropped the death penalty" against Sheffield and that his solo conviction for a subsequent murder established that Garcia was a minor participant in the Harley's murder.

*Garcia*, 224 Ariz. at 19–20, 226 P.3d at 388–89.

Garcia argues that this decision is based on an unreasonable determination of the facts.  (Doc. 22 at 105.)  The Court disagrees.  There are no factual errors in the Arizona Supreme Court's ruling, at least none that benefit Garcia.  As the court noted, the jury heard testimony about the additional murder Sheffield committed and the plea bargain that spared his life.  (RT 12/18/07 at 12–13, 16–17, 19–22.)  The jury also had the sentencing documents from that case.  Even if the jury did not have the plea agreement itself, Garcia was not prejudiced by that omission.  The jury knew of Sheffield's crimes and sentences.

Garcia also argues that the Arizona Supreme Court's decision was "unreasonable in light of Supreme Court precedent."  (Doc. 22 at 105–06.)  Citing *Johnson v. Williams*, 568 U.S. 289 (2013), Garcia contends that review of this claim is de novo because the Arizona Supreme Court did not address its "federal constitutional aspects."  (Doc. 22 at 103.)

In *Williams*, the Supreme Court held that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted."  *Id.* at 301.  For example, "[w]hen the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court,

---

[8] Detective Sandra Rodriguez was the case agent for the Harley's murder.

§ 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge." *Id.* at 303.

The Arizona Supreme Court addressed Garcia's claim, *Garcia*, 224 Ariz. at 19–20, 226 P.3d at 388–89, and necessarily addressed his arguments under the United States Constitution because those were the only arguments made. (Doc. 29-1 at 144-45.) The court did not cite the federal constitution or federal caselaw, but § 2254(d) does not require a state court to "cite or even be aware of" Supreme Court precedent. *Richter*, 562 U.S. at 98 (citing *Early v. Packer*, 537 U.S. 3, 8 (2002)). It is Garcia's burden to "show[] there was no reasonable basis for the state court to deny relief." *Id.* He has not met this burden.

For the reasons described above, the trial court's refusal to provide the jury with Sheffield's plea agreement did not violate Garcia's Sixth Amendment right to present witnesses on his own behalf, *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), or deny him a "meaningful opportunity to present a complete defense," *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). The jury heard about the liquor store murder Sheffield committed and the resulting plea agreement, so any error arising from the failure to submit the plea agreement to the jury was harmless. *See Fry v. Pliler*, 551 U.S. 112, 120–22 (2007) ("[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*. . . .") (citing *Brecht v. Abrahamson*, 507 U.S. 619 (1993)).

The Arizona Supreme Court's decision was not unreasonable in the light of Supreme Court precedent holding that a sentencer cannot be barred from considering relevant mitigating evidence. *See, e.g.*, *Tennard v. Dretke*, 542 U.S. 274, 285 (2004); *Boyde v. California*, 494 U.S. 370, 377–78 (1990). The jury in this case was not barred from considering Sheffield's murder conviction and plea agreement.

The decision of the Arizona Supreme Court was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. Claim 3 is therefore denied lacking merit.

/ / /

1

**Claim 5**:

2       Garcia alleges that the admission of Daniel Anderson's pretrial and trial

3   identifications resulted from unduly suggestive identification procedures and violated

4   Garcia's right to due process under the Fourteenth Amendment. (Doc. 22 at 110-114.)  The

5   Arizona Supreme Court denied this claim on direct review.  *Garcia*, 224 Ariz. at 7–8, 226

6   P.3d at 376–77.  Garcia argues that the court's decision was contrary to or an unreasonable

7   application of clearly established federal law and based on an unreasonable determination

8   of the facts.  The Court addressed this claim in some detail in its order denying further

9   evidentiary development (Doc. 50 at 31-33), and will not repeat the entire discussion here.

10       Courts use a two-step approach to determine whether the Due Process Clause

11   requires suppression of an eyewitness identification arranged by police.  *Perry v. New*

12   *Hampshire*, 565 U.S. 228, 238–41 (2012).  If police used "an identification procedure that

13   is both suggestive and unnecessary," the court must then determine under the totality of

14   the circumstances whether the improper procedure created a "substantial likelihood of

15   misidentification."  *Id.* at 238–39 (citing *Neil v. Biggers*, 409 U.S. 188, 201 (1972)).

16       But an inquiry into the reliability of the identification is not required as part of a due

17   process challenge unless the state had a hand in bringing about the unreliability.  As the

18   Supreme Court explained in *Perry*:

19       We have not extended pretrial screening for reliability to cases in which the
20       suggestive circumstances were not arranged by law enforcement officers.
         Petitioner requests that we do so because of the grave risk that mistaken
21       identification will yield a miscarriage of justice.  Our decisions, however,
         turn on the presence of state action and aim to deter police from rigging
22       identification procedures, for example, at a lineup, showup, or photograph
         array.  When no improper law enforcement activity is involved, we hold, it
23       suffices to test reliability through the rights and opportunities generally
         designed for that purpose, notably, the presence of counsel at postindictment
24       lineups, vigorous cross-examination, protective rules of evidence, and jury
         instructions on both the fallibility of eyewitness identification and the
25       requirement that guilt be proved beyond a reasonable doubt.
26
27

28   *Id*. at 232-33.

1     The trial court held a hearing on Anderson's identification of Garcia.  Anderson

2     testified that, on the day of the shooting, he gave Detective Sandra Rodriguez a detailed

3     description of the first man to enter the bar.  (RT 8/31/07 at 14.)  Three days later, however,

4     he was unable to identify Garcia in a photo line-up.  (*Id.* at 16.)  The police told Anderson

5     to avoid watching media coverage of the crime, but he later saw photos of Garcia and

6     Sheffield on a reward flier.  (*Id.*  16–17.)  At the hearing, Anderson identified Garcia as

7     one of the men who entered the bar.  (*Id.* at 17.)

8     Detective Rodriguez testified that the police department gave television stations

9     copies of photos from a bus security camera showing Garcia and Sheffield.  (*Id.* at 52.)

10    She also testified that the police did not create or distribute the reward fliers.  (*Id.* at 53,

11    57–58.)

12    The  trial  court  denied  Garcia's  motion  to  suppress  Anderson's  identification,

13    concluding that the photographic lineup was not unduly suggestive and the identification

14    was not tainted because the police were not responsible for the flier.  (ME 9/6/07 at 4.)  The

15    Arizona Supreme Court agreed that the State was not sufficiently responsible for the flier

16    to trigger Garcia's due process rights.  *Garcia*, 224 Ariz. at 8, 226 P.3d at 377 ("The due

17    process  clause  does  not  preclude  every  identification  that  is  arguably  unreliable;  it

18    precludes identification testimony procured *by the state* through unduly suggestive pretrial

19    procedures.") (quotation omitted).

20    As  this  Court  noted  in  its  order  denying  evidentiary  development,  the  Arizona

21    Supreme Court's decision "did not unreasonably apply clearly established federal law or

22    rely on unreasonable conclusions of fact under § 2254(d)."  (Doc. 50 at 31.)  The Court

23    rejected Garcia's argument that under *Biggers*, 409 U.S. at 198, the Arizona Supreme Court

24    was required to address whether the identification was unreliable under the "totality of the

25    circumstances."  (Doc. 50 at 32.)  Doing so would have been inconsistent with *Perry's*

26    holding that the Due Process Clause requires an inquiry into reliability only when

27    unnecessarily suggestive circumstances were arranged by law enforcement.  *Perry*, 565

28    U.S. at 232-33; *see also Schroeder v. Premo*, 714 F.App'x 666, 669 (9th Cir. 2017) (finding

1  no due process violation where witness saw a newspaper photo of defendant and newsclip
2  about the case before identifying defendant in photo lineup because law enforcement had
3  nothing to do with the witness reading the paper or seeing the clip) (citing *Perry*, 565 U.S.
4  at 238–41).

5       Nor was the Arizona Supreme Court's decision based on an unreasonable
6  determination of the facts. The state courts found that the police did not create or distribute
7  the reward flier. That factual determination is presumed correct, 28 U.S.C. § 2254(e)(1),
8  and Garcia has done nothing to rebut it, much less by clear and convincing evidence. (*Id.*,
9  Doc. 50 at 31–32) Garcia alleges that "there was no definitive evidence that the fliers were
10 not created or distributed by the police," and even if the police did not create the fliers, they
11 were nonetheless "responsible for" the witness's "resulting exposure to them." (Doc. 22 at
12 114.) But Detective Rodriguez testified that the state obtained the photographs from the
13 City of Phoenix and distributed them to the media, and did not create the fliers. (RT
14 8/31/07 at 54:3-7, 57:2-58:18.) This testimony was never contradicted and adequately
15 supports the state courts' conclusion that the State did not create the fliers. Garcia does not
16 explain how the State was responsible for distribution of the fliers, and as the Arizona
17 Supreme Court noted, law enforcement advised Anderson not to watch media about the
18 event. *Garcia*, 224 Ariz. at 8, 226 P.3d at 377. Garcia has not shown that the state courts'
19 determination of facts was unreasonable. *Miller-El I*, 537 U.S. at 340 ("a decision
20 adjudicated on the merits in a state court and based on a factual determination will not be
21 overturned on factual grounds unless objectively unreasonable in light of the evidence
22 presented in the state-court proceeding").

23      The Arizona Supreme Court's denial of this claim was neither contrary to nor an
24 unreasonable application of clearly established federal law, nor was it based on an
25 unreasonable determination of the facts. Claim 5 is denied as lacking merit.

26      **Claim 6:**

27      Garcia alleges that the trial court's rulings during voir dire violated his right to a fair
28 and impartial jury because they allowed the State to "fill the jury with pro-death jurors."

(Doc. 22 at 114.)   The claim consists of two subclaims.   In 6(A), Garcia alleges that his rights were violated when the State was permitted to ask potential jurors case-specific questions.   (*Id.* at 115–17.)   In 6(B), Garcia alleges that the trial court impermissibly struck a "life-scrupled" juror.   (*Id.* at 117–19.)   The Arizona Supreme Court rejected both claims. *Garcia*, 224 Ariz. at 8–9, 226 P.3d at 377–78.

　　　　　　　　　　　　<u>Clearly established federal law</u>

　　　　　A prospective juror in a capital case may be excluded for anti-death-penalty views if he indicates he is "irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings."   *Witherspoon v. Illinois*, 391 U.S. 510, 522 n.21 (1968).   But the exclusion of jurors for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction" violates the Constitution.   *Id.*

　　　　　In *Adams v. Texas*, 448 U.S. 38 (1980), the Supreme Court held that a prospective juror's views on the death penalty could not be challenged for cause unless those views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.   The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court."   *Id.* at 45.   In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Court reaffirmed the *Adams* standard, holding that dismissal for cause is appropriate if the prospective juror's views "prevent or substantially impair" his ability to follow the law.   *Id.* at 424.

　　　　　A state court's determination that a juror's views would substantially impair the discharge of his duties is a factual finding entitled to a presumption of correctness on federal habeas review.   *Witt*, 469 U.S. at 426 ("[D]eference must be paid to the trial judge who sees and hears the juror."); *see Uttecht v. Brown*, 551 U.S. 1, 9 (2007) ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.").   AEDPA requires an additional,

1  "independent, high standard" of deference.  *Uttecht*, 551 U.S. at 10; *see White v. Wheeler*,

2  577 U.S. 73, 78 (2015).  A trial court's "finding may be upheld even in the absence of clear

3  statements from the juror that he or she is impaired[.]"  *Uttecht*, 551 U.S. at 7.

4       Claim 6(A)

5       As discussed above, during voir dire the prosecutor asked potential jurors if they

6  could impose the death penalty where the victim was killed during a robbery but the

7  defendant was not the actual shooter.  (*See* RT 10/11/07, Vol. 1 at 70, 72; Vol 2 at 7, 14,

8  26.)  In questioning one of the potential jurors, the prosecutor added that blood evidence

9  showed the defendant, while not the shooter, was in close proximity to the shooting.  (*Id.*

10  Vol 1 at 14.)  Defense counsel objected and moved to prevent the prosecutor from asking

11  additional case-specific questions.  (RT 10/12/07 at 2.)  The trial court indicated that the

12  prosecutor could ask questions framed as hypotheticals, and defense counsel agreed.  (*Id.*

13  at 5–7.)  Counsel again objected when the prosecutor referred directly to Garcia while

14  questioning one of the  jurors.  (*Id.* at 14.)  The prosecutor thereafter framed his questions

15  as hypotheticals.  (*See id.* at 50, 64; RT 10/16/07 at 8, 17, 118, 123, 160–62; RT 10/17/07

16  at  6, 47.)

17       On direct appeal, the Arizona Supreme Court held that the trial court "did not abuse

18  its discretion in allowing the State to ask prospective jurors if they could consider imposing

19  a death sentence if a defendant had not actually shot the victim."  *Garcia*, 224 Ariz. at 9,

20  226 P.3d at 378.  The court found that the prosecutor's questions did not attempt to "elicit

21  how prospective jurors will vote based on specific facts," nor did the prosecutor "ask[]

22  jurors to precommit to a specific position; rather, [he] merely asked jurors if they

23  could *consider* the death penalty in circumstances in which it is permitted under Arizona

24  law."  *Id.*  The court also found that the questions "properly probed beyond abstract juror

25  views on capital punishment."  *Id.*

26       Garcia argues that this decision was an unreasonable application of clearly-

27  established federal law.  He cites three Supreme Court cases – *Witherspoon*, *Adams*, and

28  *Witt* (Doc. 22 at 116) – but none of them suggests that the questions asked by the state in

this case violated the Constitution.  As noted above, *Witherspoon* held that a juror could be excused if he was "irrevocably committed . . . to vote against the penalty of death."  391 U.S. at 522 n.21.  *Adams* held that a juror can be challenged for cause if his views "would prevent or substantially impair the performance of his duties as a juror."  448 U.S. at 45. *Witt* applied the same standard.  469 U.S. at 424.  These cases all imply that it is appropriate to inquire into whether a juror can apply the death penalty in the case at hand.  Garcia does not explain how the questions asked by the prosecution violated the intent of these cases. (Doc. 22 at 116-117.)[9]

Garcia cites two Ninth Circuit cases in support of his argument – *Mach v. Stewart*, 137 F.3d 630 (9th Cir. 1998), and *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir. 1979) – but these decisions are not clearly-established federal law under AEDPA.  *See Matthews*, 567 U.S. at 48–49 ("[C]ircuit precedent does not constitute 'clearly established Federal law'" and "cannot form the basis for habeas relief under AEDPA."); *see also Carey v. Musladin*, 549 U.S. at 76–77 (explaining that relief under AEDPA cannot be granted where there is no clearly established federal law).

What is more, these cases bear no factual resemblance to Garcia's.  The defendant in *Mach* was charged with sexual misconduct with a minor.  One of the prospective jurors was a social worker who, when questioned by the court, stated she would have a difficult time being impartial given her line of work and added that in every case she had been involved with over a period of three years her clients' reports of sexual abuse had been confirmed.  137 F.3d at 632.  On three more occasions the juror repeated that she was unaware of a child ever lying about being sexually assaulted.  *Id.*  The Ninth Circuit found that her repeated "expert-like statements" tainted the entire jury panel.  *Id.* at 632–33.

---

[9] Garcia notes that the prosecutor filed a motion in the trial court to preclude defense counsel from asking various fact-specific questions, citing cases from Maryland, Texas, and the Fourth Circuit, and argues that the prosecutor should be held to the same standard. (Doc. 22 at 116.)  But Garcia does not assert that the state and appellate cases cited by the prosecutor constitute clearly-established federal law for habeas purposes.  (*Id.*)

1    Nothing remotely similar happened during voir dire in Garcia's case, where the prosecutor

2    merely asked hypothetical questions based on the evidence in the case.

3        In *Eubanks*, the Ninth Circuit found that the trial court erred in denying the

4    defendants' motion for a new trial on heroin trafficking charges where one of the jurors

5    concealed the fact that he had two sons who were serving long prison terms for crimes

6    related to their own heroin use.  591 F.2d at 516–17.  The court explained that the

7    allegations of juror bias were "extremely serious and the facts upon which they were

8    founded were not open to dispute."  *Id.* at 517.  The juror would have been excused if he

9    had revealed the information during voir dire, and his presence on the jury denied the

10   defendants their right to an impartial panel.  *Id.*  Again, this scenario bears no relationship

11   to Garcia's claim that the prosecutor's case-specific questions led to a "pro-death" jury.

12       Garcia has not shown that the Arizona Supreme Court's denial of this claim was

13   contrary to or an unreasonable application of clearly-established federal law.  Claim 6(A)

14   is denied on the merits.

15       Claim 6(B)

16       Garcia alleges that the trial court erroneously struck Juror O for his anti-death

17   penalty views. (Doc. 22 at 117–19.) On his questionnaire and during extensive questioning

18   by the prosecutor and defense counsel, Juror O expressed serious reservations about voting

19   for a death sentence.  (*See* RT 10/17/07 at 12–17.)  Here is an example of some of his

20   statements:

21       The prosecutor:  Would I be correct in assuming that your feelings are really
22       going to make it almost impossible to vote for death?

23       Juror O:  Almost impossible.

24       The prosecutor:  And you might require evidence that goes beyond what is
25       required?

26       Juror O:  I have a hard time dealing with hypotheticals like that, yeah.  Kind
27       of.  It might be the case.

28

The prosecutor:  If there's any mitigation at all, you are going to say that's fine, I'm not going to consider the aggravation.  I'm so strongly in favor of the life sentence that am going to --

Juror O:  That would probably be the case, yes.

(*Id*. at 15-17.)  At some points during the questioning Juror O indicated he could follow the law, but he was "not positive" he could vote for death and would "heavily lean" in favor of life.  (*Id.* at  16.)

The trial court granted the prosecutor's motion to strike Juror O.  Commenting on the juror's answers about the death penalty, the court noted that "every single one of them he had to include a qualifier before he said he would be able to [vote for death].  I think I could; I don't know if I could vote for death; very conflicted about it; I am not positive I could.  His feelings, it's almost impossible to vote for death."  (*Id.* at 70–71.)

The Arizona Supreme Court found that the trial court did not abuse its discretion in striking Juror O.  The court explained that "[e]ven if a juror is sincere in his promises to uphold the law, a judge may still reasonably find a juror's equivocation about whether he would take his personal biases into the jury room sufficient to substantially impair his duties as a juror, allowing a strike for cause."  *Garcia*, 224 Ariz. at 9, 226 P.3d at 378 (quoting *State v. Ellison*, 213 Ariz. 116, 137, 140 P.3d 899, 920 (2006) (additional quotes omitted).  The court held that the trial judge "could have reasonably concluded that Juror O.'s performance would be substantially impaired by his feelings about capital punishment."  *Id.*

This decision is consistent with case law from the United States Supreme Court.  In *Uttecht*, the Supreme Court confronted a similar situation – an excused juror in a death penalty case who had said at least six times that he could follow the law, but who also made statements suggesting he would hesitate to impose the death penalty and was confused about when it might be proper.  551 U.S. at 16.  The Supreme Court found that the trial court's decision to excuse the juror was entitled to deference because the court "had an opportunity to observe the [juror's] demeanor."  *Id.* at 17.  The juror's assurances that he

would follow the law and could consider imposing the death penalty were insufficient to overcome the "reasonable inference from his other statements that in fact he would be substantially impaired" in voting for the death penalty.  *Id.* at 18.  Similarly, in *Wheeler* the Supreme Court explained that "[t]he juror's confirmation that he was 'not absolutely certain whether [he] could realistically consider' the death penalty . . . was a reasonable basis for the trial judge to conclude that the juror was unable to give that penalty fair consideration."  577 U.S. at 79; *see also Morales v. Mitchell*, 507 F.3d 916, 941 (6th Cir. 2007) ("[I]solated statements indicating an ability to impose the death penalty do not suffice to preclude the prosecution from striking for cause a juror whose responses, taken together, indicate a lack of such ability or a failure to comprehend the responsibilities of a juror.").

In Garcia's case, Juror O indicated in several answers that he would have considerable difficulty imposing a death sentence.  Viewed with appropriate deference as the Supreme Court has directed, the trial court had a sufficient basis to conclude that the juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Adams*, 448 U.S. at 45.  Juror O's selected statements that he could be objective did not require the trial court to disregard his other comments that he would have great difficulty imposing the death penalty.  *Uttecht*, 551 U.S. at 18.

The Arizona Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.  Claim 6(B) is denied.

**Claim 7:**

Garcia alleges that the trial court violated his rights under the Sixth and Fourteenth Amendments by failing to declare a mistrial of the guilt phase based on jury misconduct. (Doc. 22 at 119.)

Background

At the beginning of Garcia's trial, the court admonished the jurors not to talk to each other or anyone else about the case "until the end of trial when you go to the jury room to

- 28 -

decide on your verdict." (RT 10/22/07 at 24.) The jury found Garcia guilty on November 13, 2007. The aggravation phase of the trial began on November 15, 2007, before the same jury. During the lunch break on the first day of the aggravation phase, Juror P informed the trial court that she believed members of Garcia's family had contacted her. (RT 11/15/07 at 49–50.) In chambers she testified that two or three weeks earlier an Hispanic male had come to her house. (*Id.* at 51–52.) He repeatedly rang her doorbell and banged on her door. (*Id.*) When she answered the door, he asked if she wanted to have weeds pulled from her yard. (*Id.* at 52.) She said no and he left. (*Id.*) Juror P then told the court that a similar-looking Hispanic male had appeared at her house the previous afternoon (November 14), again ringing her doorbell repeatedly and banging on her door, this time asking if she wanted to sell her SUV. (*Id.* at 53.) During their conversation, Juror P saw an SUV parked in front her house with a woman and a young child inside. (*Id.* at 54.) Juror P told the man that she would not sell her vehicle and asked him to leave. (*Id.* at 56.) As he walked away, Juror P heard the woman in the SUV say something about "Jeffrey Dalmer [sic] and eating people or something." (*Id.*)

In the courtroom that morning (November 15), Juror P noticed a woman sitting in the audience on Garcia's side of the room who she thought looked like the woman in the SUV from the day before. (*Id.*) This was the first time she connected the incidents at her home with Garcia's family members. (*Id.* at 57.) Juror P said she was "rattled" and "exasperated" by these "weird, unorthodox" incidents. (*Id.* at 56–57.) At lunch that day, before notifying the court, Juror P told some of the other jurors about the "spooky" occurrences because she was concerned for their safety. (*Id.* at 58–60.) She told the judge, however, that she could set the incidents aside and "judge this case impartially from here on out." (*Id.* at 60.)

The parties questioned Juror P and the jurors with whom she had spoken. Juror P confirmed that she did not connect the incidents to Garcia, and did not discuss the incidents with other jurors, until coming into court the first day of the aggravation trial. (*Id.* at 63.) She also testified that the incidents did not have "anything to do with [her] deliberations"

1   in the guilt phase.  (*Id.* at 61.)

2         The parties agreed to remove Juror P from the jury.  (*Id.* at 68, 99.)  Defense counsel

3   moved for a mistrial of the aggravation phase, but not of the guilt phase, and the trial court

4   granted the motion.  (*Id.* at 95–99.)  A separate jury was seated for the aggravation phase.

5         On direct appeal, the Arizona Supreme Court denied Garcia's claim that the trial

6   court erred "in failing to sua sponte also grant a mistrial for the already completed guilt

7   phase."  *Garcia*, 224 Ariz. at 11, 226 P.3d at 380.  The court found that the trial judge's

8   response to the juror misconduct was "commensurate with the severity of the threat posed."

9   *Id.* (citations omitted).  The court explained:

10         [T]he trial court's decision to grant a mistrial as to the aggravation phase
11         alone was sufficient in light of the limited nature of the potential prejudice.
           The risk of prejudice arose only after Juror P. connected the incidents to
12         Garcia and told other jurors about them, possibly tainting their perceptions,
13         all of which occurred after the guilt phase.

14   *Id.*  Garcia argues that this decision was contrary to and an unreasonable application of

15   clearly-established federal law and based on an unreasonable determination of the facts.

16         <u>Analysis</u>

17         Garcia asserts that his rights to a trial free of jury misconduct and racial prejudice

18   were violated.  (Doc. 22 at 120.)  As clearly-established federal law, Garcia cites *Remmer*

19   *v. United States*, 347 U.S. 227 (1954), which held that certain types of jury tampering or

20   misconduct, including private communication with a juror about a trial, are presumptively

21   prejudicial so that a hearing is required to determine the effect of the misconduct.  Garcia

22   contends that the Arizona Supreme Court ignored this precedent.  (*Id.* at 126.)  He also

23   argues that the court made a factual error in characterizing the incident as involving only

24   "potential juror misconduct" when in fact the misconduct did occur.  (*Id.*, citing *Garcia*,

25   224 Ariz. at 11, 226 P.3d at 380.)  These arguments are unpersuasive.

26         In approving the trial court's response to Juror P's conduct, the Arizona Supreme

27   Court cited *State v. Miller*, 178 Ariz. 555, 557, 875 P.2d 788, 790 (1994).  *Garcia*, 224

28   Ariz. at 11, 226 P.3d at 380.  In *Miller*, the Arizona Supreme Court cited *Remmer* for the

proposition that some types of jury misconduct can be presumptively prejudicial.  178 Ariz. at 557, 875 P.2d at 790.  The court then found that the trial court's failure to inquire further into an incident of presumptively prejudicial misconduct—a dismissed alternative juror left a note on the windshield of a sitting juror's vehicle stating the defendant was guilty—was insufficient to the threat posed by the misconduct.  *Id.*  In Garcia's case, by contrast, the trial court held a hearing on the allegations of juror misconduct and declared a mistrial as to the aggravation phase.  The Arizona Supreme Court did not unreasonably apply *Remmer* when it determined that the course taken by the trial court was commensurate to the threat posed by the misconduct.

The Arizona Supreme Court likewise did not err in identifying the salient fact: that any misconduct occurred after the guilt phase of trial, when Juror P shared with other jurors her story about being contacted by Hispanic males and seeing a woman outside her home who resembled one of the women in the courtroom.  To be entitled to relief on a claim of juror misconduct, Garcia must show that the misconduct had a "substantial and injurious effect or influence in determining the jury's verdict." *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000) (quoting *Brecht*, 507 U.S. at 623); *see Brown v. Ornoski*, 503 F.3d 1006, 1018 (9th Cir. 2007).  The verdict at issue in this claim is the guilty verdict.  Garcia has cited no cases holding that jury misconduct occurring *after* a verdict requires a mistrial.  Because it occurred only after the guilty verdict was rendered, Garcia cannot show the misconduct had any negative effect or influence.

 Garcia also asserts that Juror P's statements indicated a bias against Hispanics which tainted the guilty verdict.  (Doc. 22 at 115, 125; *see* Doc. 35 at 50.) The United States Supreme Court has not "decide[d] the appropriate standard for determining when evidence of racial bias is sufficient to require that the verdict be set aside and a new trial be granted." *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 870 (2017).  Accordingly, there is no clearly established law on this point, *see Musladin*, 549 U.S. at 76–77, so denial of the claim cannot entitle Garcia to relief under § 2254(d)(1).

The Ninth Circuit has held that a defendant would be entitled to a new trial if he

1  showed that a single juror was racially biased.  *United States v. Henley*, 238 F.3d 1111,

2  1120 (9th Cir. 2001) ("One racist juror would be enough.").  Even under this standard,

3  Garcia's claim fails because the record does not support a finding that Juror P was biased

4  against Hispanics.  Her comments simply identified the ethnicity of the individuals who

5  were involved in the incidents she described.  They did not "ascribe[] negative behavioral

6  characteristics" to Hispanics as a group or "convey[] . . . overt prejudice against" Hispanics.

7  *United States v. Hayat*, 710 F.3d 875 (9th Cir. 2013) (upholding district court's finding that

8  juror's comments did not indicate actual racial or ethnic bias).

9      The Arizona Supreme Court's denial of this claim was neither contrary to nor an

10  unreasonable application of clearly-established federal law, nor was it based on an

11  unreasonable determination of the facts.  Claim 7 is denied.

12      **Claim 8:**

13      Garcia alleges that the trial court violated his due process rights by admitting

14  prejudicial and inflammatory prior bad act evidence during the aggravation phase of trial.

15  (Doc. 22 at 127.)  The Arizona Supreme Court rejected this claim on direct appeal.  *Garcia*,

16  224 Ariz. at 11–12, 226 P.3d at 380–81.  Garcia argues the court's decision was contrary

17  to and an unreasonable application of clearly-established federal law and based on an

18  unreasonable determination of the facts.  (Doc. 22 at 127.)

19      <u>Background</u>

20      During the aggravation phase, the State sought to introduce evidence that five weeks

21  before the Harley's robbery, Garcia and Sheffield were involved in an armed robbery and

22  shooting at the RNR Stix.  The State argued that the evidence was relevant to prove that

23  Garcia had previously been convicted of a serious offense, an aggravating factor under

24  A.R.S. § 13–751(F)(2), and to establish his eligibility for the death penalty under *Tison v.*

25  *Arizona*, 481 U.S. 137, 158 (1987), by showing that he had been a major participant in the

26  Harley's robbery and had acted "with reckless indifference to human life."  The trial court

27  allowed the evidence after providing a limiting instruction.  (*See* RT 11/6/07 at 49–50; RT

28  12/10/07 at 10; RT 12/11/07 at 93–94.)

As summarized by the Arizona Supreme Court, the evidence included documents and testimony reflecting Garcia's conviction for armed robbery and documents showing Sheffield pleaded guilty to attempted murder, testimony from the investigating detective and a ballistics expert, testimony from the shooting victim, and video footage of the incident. *Garcia*, 224 Ariz. at 12, 226 P.3d at 381.

The Arizona Supreme Court explained that evidence of a defendant's prior acts is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Garcia*, 224 Ariz. at 11, 226 P.3d at 380 (quoting Ariz. R. Evid. 404(b)). Before admitting such evidence, however, the trial court must find by clear and convincing evidence that the defendant committed the prior act, that the evidence is relevant, and that its probative value is not substantially outweighed by unfair prejudice. *Id.* (citation omitted). The Arizona Supreme Court found that the trial court did not abuse its discretion. *Garcia*, 224 Ariz. at 11, 226 P.3d at 380. Evidence of the RNR Stix robbery was admissible to establish the (F)(2) prior conviction aggravating factor and to show that Garcia acted with "reckless indifference" to human life during the Harley's robbery. *Id.* The court explained:

> The evidence showed that five weeks before the Harley's robbery, Garcia had participated in another armed robbery in which Sheffield shot someone. The RNR Stix victim's testimony and the video footage show that Garcia did not express surprise or abandon the robbery after Sheffield shot the victim. That Garcia would, within weeks, lead Sheffield into Harley's to commit another robbery with the same weapon is highly probative of Garcia's knowledge that the second robbery posed a grave risk of death to others.

*Id.*

Analysis

Garcia concedes that some evidence of the prior robbery was admissible to prove his eligibility for the death penalty under *Tison*. (Doc. 22 at 128.) He argues that testimony about his and Sheffield's convictions in that case would have been sufficient and that the additional evidence was cumulative and prejudicial. (*Id.* at 128–29.) This argument fails to establish that Garcia is entitled to habeas relief.

State court evidentiary rulings cannot serve as a basis for habeas relief unless the asserted error rises to the level of a federal constitutional violation. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal quotation marks and citation omitted); *see Jammal v. Van de Kamp*, 926 F.2d 918, 919–20 (9th Cir. 1991).

The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly," *Dowling v. United States*, 493 U.S. 342, 352 (1990), and "has made very few rulings regarding the admission of evidence as a violation of due process," *Holley*, 568 F.3d at 1101. The Court has declined to hold that evidence of other crimes or bad acts "so infused the trial with unfairness as to deny due process of law." *McGuire*, 502 U.S. at 75 & n.5 (noting that the Court "express[ed] no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"). Further, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley*, 568 F.3d at 1101 (citing *Musladin*, 549 U.S. at 77); *see Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) ("There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence.").

In the absence of Supreme Court precedent holding that admission of prejudicial evidence constitutes a due process violation, this Court cannot conclude that the Arizona Supreme Court's ruling was an "unreasonable application" of clearly-established federal law. *Holley*, 568 F.3d 1101. Under the strict standards of AEDPA, Garcia's claim that the RNR Stix evidence was unfairly prejudicial is foreclosed because a federal court is "without power" to grant a habeas petition based solely on the admission of evidence. *Id.*; *see also Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008) (holding that the state court did not unreasonably apply clearly-established law in finding that the admission of

defendant's criminal history was not a due process violation because "[t]he Supreme Court has expressly reserved the question of whether using evidence of [a] defendant's past crimes to show that he has a propensity for criminal activity could ever violate due process").

Claim 8 is therefore denied.

**Claim 9:**

Garcia alleges that the state courts violated his Eighth Amendment rights by failing to comply with the holdings in *Enmund* and *Tison*. (Doc. 22 at 130.) Specifically, he alleges that (A) the jury should have made its *Enmund/Tison* determination during the guilt phase or, alternatively, the trial court should have bifurcated the *Enmund/Tison* and aggravation phases; (B) the trial court committed structural error when it gave the jury an improper *Enmund/Tison* instruction; and (C) there was insufficient evidence to support the jury's *Enmund/Tison* finding. The Court denied the last of these arguments in its order denying evidentiary development. (Doc. 50 at 34–36.) The Court now addresses the remaining claims.

Bifurcation

The first judge assigned to Garcia's case granted his motion to have the *Enmund/Tison* inquiry resolved in the guilt phase of trial. After the case was reassigned, the second judge reversed that decision and ruled that the *Enmund/Tison* finding would be made in the aggravation phase. After the jury returned its guilty verdict, Garcia moved to bifurcate the aggravation phase so that the *Enmund/Tison* issue was resolved separately from the aggravation issue. The trial court denied the motion. (ME 11/15/07.)

The Arizona Supreme Court held that the second judge did not abuse his discretion by reconsidering the prior judge's decision. *Garcia*, 224 Ariz. at 13, 226 P.3d at 382. The court cited Rule 16.1(d) of the Arizona Rules of Criminal Procedure, which provides that an issue decided by the court may not be reconsidered except for "good cause." *Id.* The court also cited *State v. King*, 180 Ariz. 268, 883 P.2d 1024 (1994), for the proposition that Rule 16.1(d) and the law-of-the-case doctrine "do not limit a court's power to change a

1    ruling simply because it ruled on the question at an earlier stage." *Id.* (quoting *King*, 180
2    Ariz. at 279, 883 P.2d at 1035). "More importantly," the court found, "in reconsidering
3    the earlier ruling, the second judge properly gave effect to Arizona law," which required
4    the trier of fact to make *Enmund/Tison* findings in the aggravation phase of trial. *Id.*
5    (citations omitted).

6          The Arizona Supreme Court then found that the trial judge did not abuse his
7    discretion in failing to bifurcate the *Enmund/Tison* and aggravation issues. *Id.* The court
8    explained that Garcia was not prejudiced by the judge's decision because even with
9    bifurcation, "evidence of Garcia's involvement in the RNR Stix robbery would have been
10   admissible in that first phase to establish his reckless indifference to human life. Thus, the
11   jury would still have heard about the most damning evidence of Garcia's prior conviction
12   during a separate *Enmund/Tison* phase." *Id.* The court also rejected Garcia's argument
13   that the refusal to bifurcate violated his due process rights and his rights under the Sixth
14   and Eighth Amendments. *Id.*

15         Garcia first argues that the Arizona Supreme Court unreasonably determined the
16   facts when it found that good cause existed for the changed trial court ruling. (Doc. 22 at
17   135–36.) Garcia asserts that the court "misunderstood and misapplied the underlying facts"
18   of *King* because in that case the trial judge specifically left the issue open for rehearing
19   whereas the first judge's ruling in Garcia's case was "specific, thoroughly explained, and
20   did not leave the issue open to the option of a rehearing." (*Id.* at 136–37.) But the Arizona
21   Supreme Court's application of its precedent is binding on this Court. *Horton v. Mayle*,
22   408 F.3d 570, 576 (9th Cir. 2005) ("If a state law issue must be decided in order to decide
23   a federal habeas claim, the state's construction of its own law is binding on the federal
24   court"). Even if it were not, Garcia's argument alleges only a violation of state law for
25   which habeas relief is unavailable. *See McGuire*, 502 U.S. at 67–68; *Lewis v. Jeffers*, 497
26   U.S. 764, 780 (1990).

27         Garcia next alleges that the Arizona Supreme Court unreasonably applied clearly-
28   established federal law in upholding the trial court's denial of his request for a bifurcated

1    aggravation hearing. (Doc. 22 at 137–38.)  Citing Arizona Rule of Evidence 403, he argues

2    that evidence of his prior convictions prejudiced the jury in its analysis of the *Enmund/*

3    *Tison* issue and violated his due process rights.  (*Id.* at 138–39.)  The prior convictions

4    included, in addition to the RNR Stix armed robbery, a sexual assault conviction and two

5    other armed robbery convictions.  (*See* RT 12/13/07, p.m., at 2–3.)

6         This argument fails.  First, as the Arizona Supreme Court noted, the most "damning"

7    prior conviction evidence for purposes of the *Enmund/Tison* issue was the RNR Stix

8    robbery, which the jury would have heard even if the hearings had been bifurcated.  *Garcia*,

9    224 Ariz. at 13, 226 P.3d at 382.   Second, as previously discussed, the United States

10   Supreme Court has not ruled that admission of irrelevant or prejudicial evidence constitutes

11   a due process violation sufficient for habeas relief.  *Holley*, 568 F.3d at 1101.  Therefore,

12   the fact that the jury heard evidence of Garcia's other convictions does not entitle him to

13   habeas relief.

14        <u>Jury Instructions</u>

15        Garcia alleges that the trial court improperly instructed the jury on the definitions

16   of "major participant" and "reckless indifference" in violation of his due process rights.

17   (Doc. 22 at 139–40.)   The Arizona Supreme Court denied this claim on direct appeal.

18   *Garcia*, 224 Ariz. at 14, 226 P.3d at 383.

19        As the Arizona Supreme Court noted, Garcia asked the trial court to provide the

20   Revised Arizona Jury Instructions ("RAJI") defining "major participant" and "reckless

21   indifference," which included the following language:

> In determining whether the defendant was a "major participant" in the felony,
> some factors to consider include: the degree to which the defendant
> participated in the planning of the felony; whether the defendant possessed a
> weapon or furnished weapons to any accomplice; the degree to which the
> defendant participated in the felony; and the scope of the defendant's
> knowledge of the completion of the felony.
>
> A defendant acts with "reckless indifference" to human life when that
> defendant knowingly engages in criminal activities known to carry a grave
> risk of death to another human being. The defendant's culpability ultimately
> rests on whether the defendant was aware or believed that the defendant's

acts were likely to result in the death of a person. A finding of "reckless indifference" cannot be based solely upon a finding that the defendant was present at the time of the killing, merely participated in a crime resulting in a homicide or failed to render aid for the victims to call for help.

*Garcia*, 224 Ariz. at 14, 226 P.3d at 383 (quoting RAJI Capital 1.0 Degree of Participation).

The trial court followed the standard "major participant" instruction, but added "whether the defendant reported the crimes" as another factor for the jury to consider. (*See* RT 12/13/07, a.m., at 19–20.) The trial court provided a condensed version of the standard "reckless indifference" instruction, omitting the sentence, "The defendant's culpability ultimately rests on whether the defendant was aware or believed that the defendant's acts were likely to result in the death of a person." (*Id.* at 19.) Because Garcia did not object to the final instructions, the Arizona Supreme Court reviewed these claims under the fundamental error standard. *Garcia*, 224 Ariz. at 14, 226 P.3d at 383.

The Arizona Supreme Court found that the trial court erred by including failure to report the crime as a factor for the jury to consider in its "major participant" determination. *Id.* The court determined that the error was not fundamental, however, and that Garcia was not prejudiced given the other evidence of his participation in the robbery, including "leading Sheffield into the bar, shouting 'drop the money,' pushing Johnson up against the wall, and being in close proximity when Johnson was shot to death." *Id.* Faced with such evidence, "Garcia [could not] convincingly argue that the jury's finding of major participation rested on his failure to report the crime." *Id.*

The court also rejected Garcia's argument that the "reckless indifference" instruction "improperly relieved the State of its burden of proving that he subjectively realized that his conduct would likely lead to death." *Id.* The court explained that the instruction as given required the defendant to "knowingly engage[] in criminal activities that he's aware may likely create a grave risk of death to others." *Id.*

Garcia argues that the Arizona Supreme Court's rejection of this claim was contrary to and an unreasonable application of clearly-established federal law.[10]  (Doc. 22 at 139.)

To obtain federal habeas relief for an erroneous jury instruction, a petitioner must show that the instruction so infected the entire trial that the resulting conviction violated due process.  *McGuire*, 502 U.S. at 72; *see Cupp v. Naughten*, 414 U.S. 141, 146 (1973); *see also Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  The challenged instruction must be considered in the context of the instructions as a whole and the trial record.  *Id.*  "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."  *Middleton v. McNeil*, 541 U.S. 433, 437 (2004).  Even if an erroneous instruction violated due process, a petitioner would be entitled to habeas relief only if the error resulted in "actual prejudice" under the *Brecht* standard.[11]  *See Hall v. Haws*, 861 F.3d 977, 991 (9th Cir. 2017) (citing *Davis v. Ayala*, 576 U.S. 257, 267 (2015)); *Hedgpeth v. Pulido*, 555 U.S. 57, 60–61 (2008).

Under the *Brecht* test for actual prejudice, "relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.'"  *Ayala*, 576 U.S. at 267 (quoting

---

[10] The Court previously found that Garcia's challenge to counsel's failure to object to the "major participant" instruction lacked merit.  (Doc. 50 at 27–28.)

[11] Citing *Sullivan v. Louisiana*, 508 U.S. 275 (1993), Garcia argues that the instructions constituted structural error because they reduced the State's burden of proof. (Doc. 22 at 139.)  In *Sullivan*, the Supreme Court held that a constitutionally deficient beyond-a-reasonable-doubt instruction cannot be harmless error because it "vitiates *all* the jury's findings."  *Id.* at 281.  The Supreme Court has made clear, however, that other types of instructional error may be harmless.  *See Neder v. United States*, 527 U.S. 1, 8–10 (1999) (omission of an element of the offense subject to harmless error review); *Pope v. Illinois*, 481 U.S. 497, 501–04 (1987) (misstatement of an element of the offense not structural error); *Rose v. Clark*, 478 U.S. 570, 579–82 (1986) (erroneous burden shifting regarding an element of the offense not structural error).  The instructional errors alleged by Garcia did not lower the State's burden of proof.  Therefore, like the errors in *Neder*, *Pope*, and *Clark*, they are subject to harmless error review.

*O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). "There must be more than a 'reasonable possibility' that the error was harmful." *Id.* (quoting *Brecht*, 507 U.S. at 637).

The Arizona Supreme Court applied the fundamental error standard to reject Garcia's challenges to the jury instructions. *Garcia*, 224 Ariz. at 14, 226 P.3d at 383. Under this standard, an appellant must show that a fundamental error occurred—that is, an "error [that] goes to the foundation of his case, takes away a right that is essential to his defense, and is of such magnitude that he could not have received a fair trial"—and that the error "caused him prejudice." *State v. Henderson*, 210 Ariz. 561, 568, 115 P.3d 601, 608 (2005). To prove prejudice from a fundamentally erroneous jury instruction, an appellant "must show that a reasonable jury 'could have reached a different result' had the jury been properly instructed." *State v. James*, 231 Ariz. 490, 494, 297 P.3d 182, 186 (Ct. App. 2013) (quoting *Henderson*, 210 Ariz. at 569, 115 P.3d at 609). Pursuant to these standards, the court held that the error in the "major participant" instruction was not "of fundamental magnitude" and did not prejudice Garcia and that the "reckless indifference" instruction did not reduce the State's burden of proof. *Garcia*, 224 Ariz. at 14, 226 P.3d at 383.

The Arizona Supreme Court's rejection of this claim does not entitle Garcia to relief. The court reasonably determined that Garcia was not prejudiced by the inclusion of "whether the defendant reported the crimes" as a factor in the instruction defining "major participant." *Garcia*, 224 Ariz. at 14, 226 P.3d at 383. Based on this finding, and the record establishing the level of his participation in the robbery, Garcia cannot show the erroneous language "so infected the entire trial that the resulting conviction violates due process." *McGuire*, 502 U.S. at 72 (quoting *Naughten*, 414 U.S. at 147). The possibility that the jurors based their major-participant finding on Garcia's failure to report the crime is "too speculative to justify the conclusion that constitutional error was committed." *Kibbe*, 431 U.S. at 157.

Further, the Arizona Supreme Court's determination that the "reckless indifference" instruction was not erroneous is a binding interpretation of state law. *Bradshaw v.*

*Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.") (citing *McGuire*, 502 U.S. at 67–68; *see Gonzalez v. Gonzalez*, 394 F.App'x 415, 415–16 (9th Cir. 2010) ("The California Court of Appeal's conclusion that there was no instructional error is a binding interpretation of state law.").

Finally, even if the instructions constituted a due process violation, application of the *Brecht* harmless error standard precludes relief.[12]  The Court does not have a "grave doubt" about whether the jury would have found Garcia a major participant in the absence of the erroneous instruction language.  Ample evidence other than his failure to report the crime supported a finding of major participation, including, as the Arizona Supreme Court noted, "leading Sheffield into the bar, shouting 'drop the money,' pushing Johnson up against the wall, and being in close proximity when Johnson was shot to death," as shown by the victim's blood on a shirt worn by Garcia.  *Garcia*, 224 Ariz. at 14, 226 P.3d at 383.  Put differently, there is not a reasonable possibility that jury's determination would have been different if the instruction had been correct.  *See Ayala*, 576 U.S. at 267.  Therefore, Garcia did not suffer actual prejudice under *Brecht*.  The Court makes the same finding with respect to the language omitted from the "reckless indifference" instruction.  The missing language essentially duplicated language the trial court did provide.  There is not a reasonable possibility that the jury would have failed to find reckless indifference if the omitted sentence had been included.  Claim 9 is denied.

**Claim 10:**

Garcia alleges that his rights under the Fifth, Eighth, and Fourteenth Amendments were violated when the State failed to present sufficient evidence to prove the pecuniary gain aggravating factor.  (Doc. 22 at 144.)

---

[12] This Court undertakes the *Brecht* analysis notwithstanding the fact that the Arizona Supreme Court did not engage in harmless error review.  *See Fry v. Pliler*, 551 U.S. 112, 121–22 (2007) ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht . . .* , whether or not the state appellate court recognized the error and reviewed it for harmlessness[.]").

1    Under A.R.S. § 13–751(F)(5), an aggravating circumstance exists where "[t]he

2  defendant committed the offense as consideration for the receipt, or in expectation of the

3  receipt, of anything of pecuniary value."[13]   A finding that a murder was motivated by

4  pecuniary gain must be supported by evidence that pecuniary gain was the impetus, not

5  merely the result, of the murder.  *See Moormann v. Schriro*, 426 F.3d 1044, 1054 (9th Cir.

6  2005).  But "pecuniary gain aggravation does not require a motive to kill.  Aggravation

7  under this factor may also be based upon a causal connection between the pecuniary gain

8  objective and the killing."  *State v. Canez*, 202 Ariz. 133, 159, 42 P.3d 564, 590 (2002),

9  *supplemented*, 205 Ariz. 620, 74 P.3d 932 (2003).  "The needed connection between

10  expectation of pecuniary gain and a motive for murder often results from a finding that one

11  of the defendant's motives in committing the murder was to facilitate the taking of or ability

12  to retain items of pecuniary value."  *State v. Sansing*, 200 Ariz. 347, 354, 26 P.3d 1118,

13  1125 (2001), *vacated on other grounds*, 536 U.S. 954 (2002).

14    The Arizona Supreme Court found that the factor had been proved beyond a

15  reasonable doubt.  *Garcia*, 224 Ariz. at 20, 226 P.3d at 389.  The court detailed the evidence

16  supporting the factor:

17    Garcia led Sheffield, gun drawn, into the bar where Johnson was kneeling in
    front of the ATM.  Garcia could have seen Johnson and the ATM from
18    outside the bar's back door.  When Johnson shouted "get out" at the intruders,
    Garcia pushed him against the wall.  Anderson heard "scuffling" as he
19    escaped the bar.  Johnson's body was found outside on the back patio,
    although he had been inside when Anderson last saw him.  His body was
20    surrounded by $20 bills, some of them crumpled.  Johnson's wife testified
    that Johnson was not someone who would "back away" if threatened, and the
21    medical examiner testified that Johnson had wounds on his body that were
    consistent with an altercation.  A shirt was found near the crime scene that
22    was spotted with Johnson's blood and was missing a button.  A button
    consistent with the missing button was found near Johnson's body.  Also on
23

24

25

26  [13] In 2019 Arizona repealed and replaced the (F)(5) factor.  Under the new version, § 13-
    751(F)(3), an aggravating factor exists where: "The defendant procured the commission of
27  the offense by payment, promise of payment, or anything of pecuniary value, or the
    defendant committed the offense as the result of payment, or a promise of payment, or
28  anything of pecuniary value."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the shirt was a mixed sample of DNA that was 21,000 times more likely to have come from Garcia and two unknown individuals than from three unknown individuals.

*Garcia*, 224 Ariz. at 20, 226 P.3d at 389.

The court also noted that the murder and robbery happened within a short time, explaining that when "the killing and robbery take place almost simultaneously, we will not attempt to divine the evolution of the defendant's motive in order to discern when, or if, his reason for harming the victim shifted from pecuniary gain to personal 'amusement' or some other speculative nonpecuniary drive." *Id.* (quoting *Canez*, 202 Ariz. at 160, 42 P.3d at 591).

A habeas petitioner is not entitled to relief on a claim challenging the finding of an aggravating factor unless that finding "was not only erroneous, but 'was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation.'" *Robinson v. Schriro*, 595 F.3d 1086, 1103 (9th Cir. 2010) (quoting *Jeffers*, 497 U.S. at 780). In making that determination, the "rational factfinder" standard applies. *Jeffers*, 497 U.S. at 780 (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)). Under that standard, the question is whether, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the [aggravating factor] beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 319). "A state court's finding of an aggravating circumstance in a particular case—including a de novo finding by an appellate court[]—is arbitrary or capricious if and only if no reasonable sentencer could have so concluded." *Id.* at 783; *see Robinson*, 595 F.3d at 1103.

Garcia contends that the facts of his case "align[] more closely with a 'robbery gone bad' or a murder that occurs during the course of a robbery than with an intentional murder with the expectation of resulting pecuniary gain." (Doc. 22 at 147.) He argues that "it is possible" that the gun "went off" during the struggle with Johnson or that "Sheffield panicked and the shots were accidental." (*Id.*) These arguments misstate Arizona law and ignore the applicable standard of review.

As already noted, a motive to kill is not required to satisfy the pecuniary gain factor. *Canez*, 202 Ariz. at 159, 42 P.3d at 590. "The needed connection . . . often results from a finding that one of the defendant's motives in committing the murder was to facilitate the taking of or ability to retain items of pecuniary value." *Sansing*, 200 Ariz. at 354, 26 P.3d at 1125; *see also State v. LaGrand*, 153 Ariz. 21, 35, 734 P.2d 563, 577 (1987) ("When the defendant comes to rob, the defendant expects pecuniary gain and this desire infects all other conduct of the defendant."). Here, Garcia and Sheffield came to rob Harley's. As the Arizona Supreme Court noted, the robbery and the murder were simultaneous events, supporting a connection between the killing and a motive of pecuniary gain. *Canez*, 202 Ariz. at 160, 42 P.3d at 591.

Garcia suggests that the shooting may have been accidental. But under the rational-factfinder standard, the Court does not ask what was possible; it instead views the facts in the light most favorable to the prosecution. *Jeffers*, 497 U.S. at 780. The evidence showed that Garcia and Sheffield, who had previously committed an armed robbery and shooting at another bar, planned to rob Harley's. They waited to carry out the robbery until they saw Johnson working on the bar's cash machine. Garcia burst through the back door shouting "drop the money." Johnson was shot to death in a struggle and his body was found surrounded by $20 bills, some of them crumpled. From this evidence a rational factfinder could find that Johnson was shot to "facilitate the taking of or ability to retain" the cash from the ATM. *Sansing*, 200 Ariz. at 354, 26 P.3d at 1125.

Because the Arizona Supreme Court's conclusions with respect to the pecuniary gain factor satisfy the rational-factfinder test, *Jeffers*, 497 U.S. at 780, 783, Claim 10 is denied as meritless.

**Claim 11:**

Garcia alleges that Arizona's death penalty scheme violates the Eighth and Fourteenth Amendments by not requiring the State to prove beyond a reasonable doubt that death is the appropriate sentence. (Doc. 22 at 148.) The Arizona Supreme Court's denial

1   of this claim, *Garcia*, 224 Ariz. at 24, 226 P.3d at 393, was neither contrary to nor an

2   unreasonable application of clearly-established federal law.

3       The Constitution does not require a death penalty statute to set forth specific

4   standards for a capital sentencer to follow in its consideration of aggravating and mitigating

5   circumstances.  *See Zant v. Stephens*, 462 U.S. 862, 875 n.13 (1983) (explaining that

6   "specific standards for balancing aggravating against mitigating circumstances are not

7   constitutionally required"); *see also Tuilaepa v. California*, 512 U.S. 967, 979–80 (1994)

8   ("A capital sentencer need not be instructed how to weigh any particular fact in the capital

9   sentencing decision.").  In *Kansas v. Marsh*, 548 U.S. 163 (2006), the Supreme Court

10  explained:

> In aggregate, our precedents confer upon defendants the right to present
> sentencers with information relevant to the sentencing decision and oblige
> sentencers to consider that information in determining the appropriate
> sentence.  The thrust of our mitigation jurisprudence ends here.  "[W]e have
> never held that a specific method for balancing mitigating and aggravating
> factors in a capital sentencing proceeding is constitutionally required."

15  *Id*. at 175 (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988)).[14]

16      Thus, the Constitution does not require the capital sentencer to find that the

17  aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt.

18  *See Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998) (rejecting claim based on failure

19  to apply beyond a reasonable doubt standard at sentencing); *Williams v. Calderon*, 52 F.3d

20  1465, 1485 (9th Cir. 1995) ("[T]he failure of the statute to require a specific finding that

21  death is beyond a reasonable doubt the appropriate penalty does not render it

22  unconstitutional."); *McGill v. Ryan,* No. CV-12-01149-PHX-JJT, 2019 WL 160732, at *28

23  (D. Ariz. Jan. 10, 2019) ("There is no Supreme Court authority requiring a jury to be

24  instructed on a burden of proof in the sentencing phase of a capital case."), *aff'd sub nom.*

25  *McGill v. Shinn*, 16 F.4th 666 (9th Cir. 2021).  Claim 11 is denied.

---

[14] The Court disagrees with Garcia's suggestions that *Marsh* "indirectly questioned the
constitutionality of Arizona's death penalty statute."  (*See* Doc. 22 at 149.)  *Marsh* upheld
a Kansas statute in part because the similar Arizona statute had been upheld by the Supreme
Court in *Walton v. Arizona*, 497 U.S. 639, 651–52 (1990).  *Marsh*, 548 U.S. at 173.

**Claim 12:**

Garcia alleges that he was deprived of his rights under the Sixth, Eighth, and Fourteenth Amendments when the court released a juror after the completion of the aggravation phase of the trial and replaced her with an alternate juror for the penalty phase. (Doc. 22 at 150.)

Background

At the close of the aggravation-phase proceedings, the trial court selected four jurors as alternates, and they did not deliberate on aggravation. (RT 12/13/07, a.m., at 78.) The deliberating jurors found that the State had proved two aggravating factors and that Garcia was death-eligible under *Tison.* (RT 12/13/07, p.m., at 2–3.)

The case then moved to the penalty phase of the trial before all jurors, including the alternates. On the first day, Juror 2 called in sick with the flu and was excused without objection by the State or the defense. (RT 12/17/07 at 10.) During its penalty-phase instructions, the court reminded the jurors that "the defendant's guilt and the aggravating circumstances have already been proven beyond a reasonable doubt." (*Id.* at 15.) The court informed the jurors that their duty now was to "determine whether the defendant will be sentenced to life imprisonment or death for his conviction for the first-degree murder of Steven Johnson." (*Id.* at 13.) The court explained that:

> Your sentencing decision is not a recommendation. Your decision will be binding. If your verdict is that the defendant should be sentenced to death, the defendant will be sentenced to death. If your verdict is that the defendant should be sentenced to life, he will be sentenced to life.

(*Id.* at 18.) Before the jury retired to deliberate, the court designated one of the alternates, Juror 16, to deliberate on the penalty-phase issues in place of Juror 2. (RT 12/18/07 at 84.)

On direct appeal, Garcia argued that he was deprived of his right to a unanimous verdict on death eligibility and aggravation because the trial court failed to determine whether Juror 16 agreed with the jury's earlier findings. (Opening Br. at 74–75.) He also argued that the substitution impermissibly allowed Juror 16 to shift responsibility for the death verdict to the replaced juror. (*Id.* at 76.)

The Arizona Supreme Court rejected these arguments. *Garcia*, 224 Ariz. at 16–17, 226 P.3d at 385–86. The court first held that the juror substitution did not violate state law, including Rule 18.5 of the Arizona Rules of Criminal Procedure and *State v. Roseberry*, 210 Ariz. 360, 372–73, 111 P.3d 402, 414–15 (2005).[15]

The court noted that in *Roseberry* the trial judge allowed the State to question the new juror to show he understood that the jury had previously deliberated without him, had found the defendant guilty and that there were aggravating circumstances, and that those verdicts had to be the new juror's verdicts as well. *Garcia*, 224 Ariz. at 17, 226 P.3d at 386 (citing *Roseberry*, 210 Ariz. at 372, 111 P.3d at 414). The court explained, however, that *Roseberry* did not require such a dialogue or "suggest that an alternate's agreement with a jury's earlier findings is a prerequisite to deliberation." *Id.* The court determined that the jury instructions in Garcia's case "served the same purpose as the State's questions in *Roseberry:* they established that Juror Sixteen was to accept the jury's prior findings as his own and deliberate only on sentencing issues." *Id.* The court reiterated that Juror 16 "was well aware that his duty was to deliberate on sentencing alone." *Id.*

The court next addressed Garcia's argument that "because Juror Sixteen did not decide his death qualification in the aggravation phase, he impermissibly abdicated responsibility for his ultimate decision to the juror he replaced." *Id.* The court noted that under *Caldwell v. Mississippi*, 472 U.S. 320 (1985), it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests

---

[15] Rule 18.5(i) provides, with respect to capital cases, that "[i]n the event a deliberating juror is excused during the aggravation or penalty phases due to inability . . . to perform required duties, the court may substitute an alternate juror to join in the deliberations." The newly constituted jury may not "deliberate anew about a verdict already reached and entered." *Id.* Only if the juror substitution occurs during deliberations must the jurors "begin anew for the phase that they are currently deliberating." *Id. Roseberry* held that while it is "preferable to complete a defendant's trial with the same jury that began it," a defendant is "not constitutionally entitled to have the same jury" render verdicts in each phase. 210 Ariz. at 372, 111 P.3d at 414.

1    elsewhere." *Id.* at 328–29.  The court found, however, that "[n]o impermissible shifting of

2    responsibility occurred here."  *Id.*  The court again explained that based on the jury

3    instructions provided by the trial court, "Juror Sixteen was fully aware that he bore

4    responsibility for determining the appropriate sentence." *Id.*

5          Analysis

6          Garcia alleges that the court's decision was contrary to or an unreasonable

7    application of *Caldwell* and *Ring v. Arizona*, 536 U.S. 584 (2002) (*Ring II*), which held

8    that aggravating factors must be found unanimously.  He also argues that the decision was

9    based on an unreasonable factual determination, namely, that Juror 16 was "fully aware"

10   of his sentencing responsibility.

11         The Arizona Supreme Court reasonably rejected Garcia's argument under *Caldwell*.

12   A *Caldwell* violation occurs where comments from the prosecutor or the court "mislead

13   the jury as to its role in the sentencing process in a way that allows the jury to feel less

14   responsible than it should for the sentencing decision."  *Darden v. Wainwright*, 477 U.S.

15   168, 184 n.15 (1986); *see Romano v. Oklahoma*, 512 U.S. 1, 9 (1994).  "To establish a

16   *Caldwell* violation, a defendant necessarily must show that the remarks to the jury

17   improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489

18   U.S. 401, 407 (1989).  Garcia does not argue that the jury was subjected to any remarks

19   that incorrectly described its role in the penalty phase of his trial, nor does he cite any

20   authority for the proposition that *Caldwell* forbids the use of different guilt- and sentencing-

21   stage juries—a proposition rejected by the Arizona Supreme Court.  *Garcia*, 224 Ariz. at

22   17, 226 P.3d at 386 (citing *State v. Dann*, 220 Ariz. 351, 360–61, 207 P.3d 604, 613–14

23   (2009)); *see State v. Prince*, 226 Ariz. 516, 527, 250 P.3d 1145, 1156 (2011).  The Arizona

24   Supreme Court reasonably found no *Caldwell* violation.

25         Garcia's claim of a *Ring* violation also fails.  Garcia argues that the substitution of

26   Juror 16 into the penalty-phase jury violated his right to a unanimous verdict because the

27   juror had not participated in the aggravation and *Enmund/Tison* eligibility deliberations.

28   (Doc. 22 at 152.)  According to Garcia, the penalty-phase verdict was not unanimous

because it was not the result of deliberations which were the "common experience" of all the jurors.  (Doc. 35 at 59.)  The Court does not agree.

First, *Ring II* was satisfied in Garcia's case when the jury unanimously found that he was eligible for the death penalty under *Enmund/Tison* and that the aggravating factors had been proved.  *Ring II* held only that a jury in a capital case must unanimously determine the existence of aggravating factors that render a defendant eligible for the death penalty. 536 U.S. at 602.

Second, Garcia's argument that the penalty-phase verdict was not unanimous fails because the alternate juror was substituted before deliberations began.  In his reply brief, Garcia cites *State v. Dalton*, 239 Ariz. 74, 366 P.3d 133 (App. 2016), a case in which one of the jurors was replaced by an alternate during the second day of jury deliberations on a burglary charge.  *Id.* at 76, 366 P.3d at 135.  The court did not instruct the newly-constituted jury to begin their deliberations anew as required by Rule 18.5(h) of the Arizona Rules of Criminal Procedure.[16]  *Id.*  The Arizona Court of Appeals found that the failure to give such an instruction amounted to fundamental error and prejudiced the defendant.  *Id.* at 76, 78–79, 366 P.3d at 135, 137–38.  The Arizona Supreme Court explained that the right to a unanimous verdict under the Arizona Constitution is violated if one of the jurors "has not had the benefit of the deliberations of the other [jurors]."  *Id.* at 77, 366 P.3d at 136 (quoting *People v. Collins*, 17 Cal.3d 687, 552 P.2d 742, 746 (1976)).[17]

*Dalton* is inapposite because the substitution of Juror 16 did not take place *during*

---

[16] Under Rule 18.5(h)(3), if a juror is excused during deliberations, "the court may substitute an alternate juror to join the deliberations. . . .  If an alternate joins the deliberations, the court must instruct the jury to begin its deliberations anew."

[17] The Arizona Supreme Court vacated the Court of Appeals' opinion.  *State v. Dalton*, 241 Ariz. 182, 190, 385 P.3d 412, 420 (2016) (*abrogated on other grounds by State v. Escalante*, 245 Ariz. 135, 425 P.3d 1078 (2018)).  The court assumed without deciding that the failure to issue the "deliberate-anew" instruction constituted fundamental error, but found the defendant did not prove prejudice.  *Id.* at 186, 189–90, 385 P.3d at 416, 419–20.

deliberations.  The apparent premise of Garcia's claim is that the aggravation/eligibility phase and the penalty phase are not distinct stages of trial but a single phase for purposes of jury deliberations.  Garcia offers no support for this proposition, and it is contrary to Arizona's capital sentencing scheme, Rules of Criminal Procedure, and caselaw, all of which recognize the aggravation and penalty phases as distinct stages of trial addressing different issues.  *See*, *e.g.*, A.R.S. § 13-752(B) and (C) (describing aggravation and penalty phases of capital trials); Rule 18.5(i) (describing aggravation and penalty phases as distinct phases for purposes of deliberation); *Prince*, 226 Ariz. at 527, 250 P.3d at 1156 (holding that the use of different juries in the aggravation and penalty phases does not violate a defendant's rights) (citing *State v. Moore*, 222 Ariz. 1, 17, 213 P.3d 150, 166 (2009)).

This claim also fails because it is unsupported by clearly-established federal law. *See Tate v. Bock*, 271 F.App'x 520, 523 (6th Cir. 2008) (explaining that there is no "clearly establishe[d] constitutional right to have the jury instructed to deliberate anew after an alternate is empaneled"); *Peek v. Kemp*, 784 F.2d 1479, 1485 (11th Cir. 1984); *United States v. Evans*, 635 F.2d 1124, 1127–28 (4th Cir. 1980); *Juarez v. Montgomery*, No. CV 18-06562-AS, 2019 WL 199987, at *8 (C.D. Cal. Jan. 15, 2019) (denying habeas relief based on trial court's failure to instruct the jury to begin deliberations anew after it substituted an alternate juror, finding "there is no clearly established constitutional right to such an instruction") (citing cases).

Finally, the Court cannot accept Garcia's argument that the Arizona Supreme Court unreasonably determined the facts when it found that Juror 16 was "was well aware that his duty was to deliberate on sentencing alone."  *Garcia*, 224 Ariz. at 17, 226 P.3d at 386. That finding was not "objectively unreasonable" for purposes of § 2254(d)(2).  *See Miller-El I*, 537 U.S. at 340; *see also Wood*, 558 U.S. at 301.  Juror 16 heard the aggravation phase evidence and the trial court instructed him and the other jurors that during the penalty phase their task was to "determine whether the defendant will be sentenced to life imprisonment or death for his conviction for the first-degree murder of Steven Johnson."  (RT 12/17/07 at 13.)  The court explained that the jurors' sentencing decision was "binding," "not a

1    recommendation," and that Garcia would be sentenced to death if the jury found he should

2    be sentenced to death.  (*Id.* at 18.)

3         The Arizona Supreme Court's denial of this claim was not contrary to or an

4    unreasonable application of *Caldwell* or *Ring II*, nor was it based on an unreasonable

5    determination of the facts.  Claim 12 is denied.

6    **Claim 13:**

7         Garcia alleges that the penalty-phase jury instructions violated his Eighth and

8    Fourteenth Amendment rights.  (Doc. 22 at 152.)  He challenges the trial court's failure to

9    (A) instruct the jury that he would not be eligible for parole for 53.6 years; (B) instruct the

10   jury on the so-called "relatively minor participant" mitigating circumstance; and

11   (C) instruct the jury that it was not required to reach a verdict and that the jurors should not

12   change their honestly held beliefs simply to reach a verdict.  The Arizona Supreme Court

13   denied these claims on direct review.  *Garcia*, 224 Ariz. at 17–19, 226 P.3d at 386–88

14        Claim 13(A)

15        In his proposed instructions, Garcia asked the trial court to inform the jury that if it

16   sentenced him to life, he would not be eligible for parole for 53.6 years due to the sentences

17   he was serving on other crimes.  (ROA 353.)  The Arizona Supreme Court held that the

18   court's failure to give the instruction was not an abuse of discretion.  *Garcia*, 224 Ariz. at

19   18, 226 P.3d at 387.  Citing *Simmons v. South Carolina*, 512 U.S. 154 (1994), the court

20   held that an "instruction on parole eligibility must be given only when (1) the defendant's

21   life sentence carries no possibility of parole, and (2) the State argues that the defendant's

22   future dangerousness militates in favor of the death penalty."  *Id.*  The court explained that

23   "Garcia was not technically ineligible for parole" and "the State did not emphasize Garcia's

24   future dangerousness."  *Id.*  Specifically, the court noted that the prosecutor did not "ask

25   the jury to return a death verdict for reasons of self-defense" or "implicitly indicate that

26   Garcia would pose a threat if he were someday released from prison."  *Id.* (quotation

27   omitted).  The court also noted that the trial judge informed the jury that Garcia "face[d]

28   . . . a minimum sentence of 38.85 years," and Garcia himself "repeatedly told the jury that

he was facing decades of prison time before parole became an option." *Id.* (*see* ROA 354; RT 12/7/07 at 21.)  Therefore, "the jury received sufficient information from which it could conclude that Garcia would likely die in prison." *Id.*

Nearly a decade after Garcia's trial, the United States Supreme Court clarified that under Arizona law, specifically A.R.S. § 41-1604.09(I), parole was in fact unavailable to felons who committed their offense before January 1, 1994.  *Lynch v. Arizona*, 578 U.S. 613, 616 (2016).  Accordingly, an Arizona capital defendant like Garcia, who committed murder after 1993, is entitled to a *Simmons* parole-ineligibility instruction if the State makes his future dangerousness an issue.  *Id.*

Garcia moved this Court to stay his case after the *Lynch* decision.  (Doc. 36.)  The Court denied the stay because *Lynch* did not represent a significant change in the law that would have provided Garcia an available remedy in state court under Rule 32.1(g) of the Arizona Rules of Criminal Procedure.[18]  (Doc. 39 at 4–6.)  The Court also found that *Lynch* was not retroactive.  (*Id.* at 6.)

Garcia's claim fails on the merits.  The Arizona Supreme Court reasonably found that the State did not make an issue of Garcia's future dangerousness to a degree that required a *Simmons* instruction.

Under *Lynch* and *Simmons*, due process requires a parole-ineligibility instruction only where the state argues that the defendant's future dangerousness militates in favor of the death penalty.  *See Lynch*, 578 U.S. at 615–16.  Unlike the prosecutors in *Simmons* and *Lynch*, the State in Garcia's case did not explicitly argue that the jury should impose a death sentence in order to protect society from him.  *See Simmons*, 512 U.S. at 157 (noting the prosecution introduced evidence that the defendant was a "threat" and posed a continuing danger to elderly women and argued the jury should impose the death sentence as an act of "self-defense").

---

[18] The Arizona Supreme Court has since agreed that *Lynch* "was not a significant change in the law for purposes of permitting relief pursuant to Rule 32.1(g)." *State v. Cruz*, 251 Ariz. 203, 487 P.3d 991, 992 (2021). The court did not rule on the retroactivity issue. *Id.*, 487 P.3d at 995–96.

1   Nor did Garcia's prosecutor "accentuate[] the clear implication of future
2   dangerousness raised by the evidence." *Kelly v. South Carolina*, 534 U.S. 246, 255 (2002).
3   In *Kelly*, the prosecutor emphasized the possibility of future dangerousness by telling jurors
4   he hoped they would "never in [their] lives again have to experience . . . [b]eing some 30
5   feet away from such a person." *Id.* The prosecutor also presented evidence that while in
6   prison, Kelly made a knife, attempted to escape, and planned to hold a female guard as a
7   hostage, as well as evidence of "Kelly's sadism at an early age . . . and his inclination to
8   kill anyone who rubbed him the wrong way." *Id.*

9   Garcia concedes that the State "may not have expressly said that Garcia will be
10  dangerous in the future if released." (Doc. 22 at 154.) He contends, however, that the
11  "effect" of the prosecutor's closing argument, which included a discussion of Garcia's
12  criminal history, frequent incarcerations, and failure to rehabilitate himself, was to
13  "convince the jury" that Garcia "would undoubtedly continue along the same criminal
14  path" if released from custody. (*Id.*) But *Simmons* is implicated only where the prosecution
15  offers some evidence or argument that a defendant will be a danger if released from prison.
16  *See Kelly*, 534 U.S. at 254 n.4. That did not happen. The prosecutor simply rebutted
17  Garcia's mitigating evidence by recounting his previous crimes and his failure to take
18  advantage of opportunities for drug treatment. (*See* RT 12/18/07 at 73–76.) The
19  prosecutor's argument was "essentially backward-looking" and focused on Garcia's past
20  offenses, which "does not by itself trigger *Simmons*." *Warren v. Thomas*, 894 F.3d 609,
21  615 (4th Cir. 2015). It was not objectively unreasonable for the Arizona Supreme Court to
22  conclude that Garcia's future dangerousness was not placed in issue at sentencing and that
23  a *Simmons* instruction was not required. Claim 13(A) is denied.

24  Claim 13(B)

25  Garcia proposed a jury instruction listing "Defendant's Relatively Minor
26  Participation" as a mitigating circumstance. (ROA 353.) The Arizona Supreme Court held
27  that the trial court did not abuse its discretion in failing to provide the instruction. *Garcia*,
28  224 Ariz. at 18, 226 P.3d at 387. Citing *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998),

1   the court recognized there was a danger in giving such "potentially confining mitigating

2   instructions" when the sentencer must be free to consider any relevant mitigating evidence.

3   *Id.* (quoting *State v. Johnson*, 212 Ariz. 425, 437, 133 P.3d 735, 747 (2006)).  The court

4   then explained that "[t]he trial court here properly instructed the jurors that they could

5   consider any relevant factor as mitigating.  Garcia was permitted to argue that he was a

6   relatively minor participant; indeed, it was a theme of his penalty phase closing

7   argument."  *Id.* at 19, 226 P.3d at 388.  The court reasonably applied *Buchanan* in denying

8   this claim.

9          At the close of the penalty phase of trial, the court instructed the jurors as follows

10   with respect to mitigating evidence:

11          [A] mitigating circumstances is any factor that would leave [sic] you to apply
            leniency in this case and find that a life sentence is the appropriate sentence.

12          A mitigating circumstance is not an excuse or justification for the offense,
            but is a factor that in fairness or mercy may extenuate or reduce the

13          defendant's moral culpability.

14          A mitigating circumstance may be offered by defendant or the State or be
            apparent from the evidence presented at any phase of the proceedings,

15          irrespective of whether that evidence is being argued as a mitigating

16          circumstance.

17          The evidence to be considered by you during mitigation includes any aspect
            of the defendant's background, character or record, and any of the

18          circumstances of the offense. . . .

19          The determination of what constitutes mitigation is for each one of you to
20          resolve individually, based upon all of the evidence presented to you during
            this phase and at any of the prior phases of the trial. . . .

21          You are not limited to considering mitigation offered by the defendant.  You

22          must also consider any other relevant mitigation that was presented during
            any phase of the trial, even if it was not proposed by either of the parties. . . .

23          [Y]ou must individually consider and give effect to all of the mitigating

24          circumstances—all of the mitigating evidence presented.

25   (RT 12/18/07 at 57–58; *see* ROA 355.)

26          As the Arizona Supreme Court noted, in closing argument after these instructions,

27   defense counsel argued that Garcia's "relatively minor participation" was a "mitigating

28   factor," emphasizing the lack of evidence that Garcia intended or wanted to kill Johnson

1    and noting Sheffield's history of violence and his role as the shooter in the Harley's and

2    RNR Stix robberies and the subsequent liquor store robbery and shooting.  (RT 12/18/07

3    at 65, 69.)

4         The Eighth Amendment does not require that a jury be instructed on particular

5    statutory mitigating factors, and a "state may shape and structure the jury's consideration

6    of mitigation so long as it does not preclude the jury from giving effect to any relevant

7    mitigating evidence."  *Buchanan*, 522 U.S. at 276 (holding that defendant was not entitled

8    under the Eighth Amendment to an instruction on specific mitigating factors); *see Tuilaepa*,

9    512 U.S. at 974 ("States may adopt capital sentencing processes that rely upon the jury, in

10   its sound judgment, to exercise wide discretion.").  *Id.*  The standard for determining if an

11   instruction impermissibly forecloses consideration of mitigating evidence is "whether there

12   is a reasonable likelihood that the jury has applied the challenged instruction in a way that

13   prevents the consideration of constitutionally relevant evidence."  *Boyde,* 494 U.S. at 380.

14        Garcia's claim fails in light of this authority.  There simply "is no Supreme Court

15   precedent requiring a trial court to affirmatively instruct on the specific mitigating evidence

16   the defendant wishes the jury to consider."  *Welch v. Workman*, 639 F.3d 980, 1008 (10th

17   Cir. 2011).  The instructions in Garcia's case satisfied the standard announced in *Boyde*.

18   They placed no limits on the evidence the jury could find mitigating, and they directed the

19   jury to consider mitigation evidence presented at any phase of the trial, by either party.

20   There is no reasonable likelihood that Garcia's jury applied the instructions in a way that

21   prevented it from considering minor participation as a mitigating circumstance.

22        Claim 13(B) lacks merit.

23        Claim 13(C)

24        Garcia asked the trial court to instruct the jurors that "you should not change your

25   honest belief concerning the weight or effect of the evidence solely because of the opinions

26   of your fellow jurors, or for the mere purpose of returning a verdict."  (ROA 353.)  The

27   Arizona Supreme Court held that the trial court did not abuse its discretion by failing to

28   provide the instruction.  *Garcia*, 224 Ariz. at 18, 226 P.3d at 387.  The court noted that

1  "[t]he verdict form itself had an option for 'no unanimous agreement' which sufficiently

2  communicated to the jury that it was not required to reach a verdict" and the instructions

3  "emphasized that the [sic] each juror should make an individual decision as to the

4  sufficiency of Garcia's mitigation evidence in determining the proper sentence." *Id.*

5          Garcia's challenges to this ruling are unpersuasive.  He contends that the decision

6  is based on an unreasonable factual determination, but does not identify any factual errors.

7  (Doc. 22 at 156.)  Contrary to Garcia's assertion, it was not "illogical" for the court to find

8  that the "no unanimous verdict" option informed the jury that it was not required to come

9  to a verdict.  That is exactly what the option conveys.  Garcia also argues that the Arizona

10  Supreme Court's decision was contrary to and an unreasonable application of federal law,

11  but he fails to identify the law to which he is referring.  Garcia's arguments fall far short

12  of satisfying § 2254(d)(1) or (2).  Claim 13(C) is lacks merit.

13      **Claim 14:**

14          Garcia alleges that the Arizona Supreme Court violated his rights under the Eighth

15  and Fourteenth Amendment by failing to reduce his sentence on independent review.

16  (Doc. 22 at 156.)  Garcia contends that he raised this claim on direct appeal.  (*Id.*)  This is

17  incorrect, of course, because the claim challenges the Arizona Supreme Court's subsequent

18  ruling on independent review.  Garcia did raise the claim in his PCR petition.  (PCR pet. at

19  19–29.)  The court found the claim precluded under Rule 32.2(a)(3) because it could have

20  been raised in a motion for reconsideration to the Arizona Supreme Court.  (PCR Ruling,

21  ME 7/31/13 at 3.)  The Arizona Supreme Court summarily denied review.  (Doc. 29-4, Ex.

22  XXXX.)

23          Respondents do not challenge the state courts' procedural rulings.  They instead

24  address the claim on the merits.  (Doc. 29 at 154–55.)  Any procedural error defense is

25  therefore waived, *see Franklin v. Johnson*, 290 F.3d 1223, 1229–32 (9th Cir. 2002), and

26  the Court will consider the claim's merits.  Review is de novo.[19]

27  _____

28  [19] Garcia insists that the Arizona Supreme Court's denial of this claim was based on an
unreasonable determination of the facts and contrary to or an unreasonable application of

1   Claim 14 has two subclaims. First, Garcia argues that there was insufficient

2   evidence to support the court's finding that the pecuniary gain factor was proved. (*Id.* at

3   158.) The Court denies this claim for the reasons set forth in its analysis of Claim 10.

4   Sufficient evidence supported the pecuniary gain aggravating factor.

5   In the second subclaim, Garcia's principal argument appears to be that the Arizona

6   Supreme Court's independent review of his death sentence was constitutionally inadequate

7   because, as a result of trial counsel's ineffectiveness, the court did not have before it a

8   complete record of Garcia's mitigating evidence. (*See* Doc. 22 at 160–61.) According to

9   Garcia, "independent review cannot suffice" if trial counsel was ineffective. (*Id.* at 160.)

10   The cases Garcia cites offer no support for this proposition. In *Evitts v. Lucey*, 469 U.S.

11   387 (1985), the Court held that a criminal defendant has a due process right to the effective

12   assistance of appellate counsel. In *Clemons v. Mississippi*, 494 U.S. 738 (1990), the Court

13   held that appellate weighing or reweighing of aggravating and mitigating circumstances is

14   permissible under the Eighth Amendment. In *Parker v. Dugger*, 498 U.S. 308 (1991), the

15   Court reiterated the "crucial role of meaningful appellate review in ensuring that the death

16   penalty is not imposed arbitrarily or irrationally." *Id.* at 321.

17   In *Dugger*, the Florida Supreme Court affirmed a petitioner's death sentence after

18   striking two aggravating factors, but based its decision on an erroneous determination that

19   the trial court found no mitigation. *Id.* at 318. The trial court did find mitigating

20   circumstances. *Id.* at 318–20. Having erroneously reviewed the trial court's decision, the

21   state supreme court "did not come to its own independent factual conclusion, and it did not

22   rely on what the trial judge actually found; it relied on 'findings' of the trial judge that bear

23   no necessary relation to this case." *Id.* at 322. By striking two aggravating factors and

24   then affirming the death sentence without considering mitigating circumstances in the

25   record, the Florida Supreme Court "deprived Parker of the individualized treatment to

26   which he is entitled under the Constitution." *Id.*

27

28   clearly established federal law. (Doc. 22 at 161.) There was no merits denial of this claim,
     however, so review is not subject to § 2254(d).

The Arizona Supreme Court committed no such error in Garcia's case.  The court evaluated each of the aggravating factors and mitigating circumstances.  *Garcia*, 224 Ariz. at 20-22, 226 P.3d at 389–91.  *Parker* does not support the argument that the Arizona Supreme Court's independent review was constitutionally infirm.

More importantly, none of the cases cited by Garcia suggests that appellate review is insufficient if additional mitigating evidence, which would have been presented by competent trial counsel, is developed after the appeal is decided.  To the contrary, that standard would preclude any review, meaningful or otherwise, of a death sentence since at the time of the direct appeal no claim of ineffective assistance has been raised let alone decided.  *Cf. Martinez*, 566 U.S. at 11 (noting that in Arizona "the initial-review collateral proceeding is the first designated proceeding for a prisoner to raise a claim of ineffective assistance at trial" and "the collateral proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance claim").

Meaningful appellate review means review of the sentence rendered in state court on the record established in state court.  If additional mitigating evidence should have been presented, a petitioner may be entitled to PCR or habeas relief in a subsequent claim of ineffective assistance of trial counsel.

Garcia also alleges that the Arizona Supreme Court's review of his sentence was "constitutionally infirm" because the court considered the "unproved" pecuniary gain factor and because there were no special verdict forms "from which the court could assess what the jurors considered."  (Doc. 22 at 161.)  The Court does not agree.  First, as already explained, the Arizona Supreme Court reasonably determined that the pecuniary gain factor was proved.  Second, the United States Supreme Court has rejected the argument "that without written jury findings concerning mitigating circumstances, appellate courts cannot perform their proper role. . . .   An appellate court [can] evaluate any evidence relating to mitigating factors without the assistance of written jury findings."  *Clemons*, 494 U.S. at 750.

Claim 14 is denied.

1

**Claim 16:**

Garcia alleges that wrongful conduct by former Maricopa County Attorney Andrew Thomas and his associates, unrelated to this case, denied him the right to an impartial judge and a fair capital trial, sentencing, and appeal in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. 22 at 165.)  He did not raise this claim in state court.  (*Id.*)  He argues that its default is excused by the ineffective assistance of appellate and PCR counsel.  (*Id.*)  He is incorrect.

First, ineffective assistance of appellate counsel may be used as cause to excuse a procedural default only where the particular ineffective assistance allegation was first exhausted in state court as an independent constitutional claim.  *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Murray v. Carrier*, 477 U.S. 478, 489–90 (1986).  Garcia did not raise such a claim of ineffective assistance of appellate counsel.  Second, under *Martinez* the ineffective assistance of PCR counsel can excuse the default only of claims of ineffective assistance of trial counsel.  *See Martinez (Ernesto)*, 926 F.3d at 1225 (explaining that ineffective assistance of PCR counsel does not excuse default of judicial bias claim); *Pizzuto*, 783 F.3d at 1177.  Accordingly, Claim 16 remains defaulted and barred from federal review.

**Claim 17:**

Garcia alleges that the application of Arizona's newly-enacted death penalty statute to his sentence violated the *ex post facto* doctrine.[20]  (Doc. 22 at 172.)  Garcia included this claim in his PCR petition as an "issue raised to avoid preclusion."  (PCR Pet. at 68.)  The PCR court found the claim precluded under Rule 32.2(a)(3).  Garcia argues that the claim's default is excused by the ineffective assistance of appellate and PCR counsel.  (*Id.*)  Again,

---

[20] Johnson's murder took place on May 21, 2002.  In June 2002, the United States Supreme Court invalidated Arizona's capital sentencing scheme because it required the sentencing judge, rather than a jury, to find the aggravating circumstances necessary for imposition of the death penalty.  *Ring II*, 536 U.S. at 609.  On August 1, 2002, Arizona amended its death penalty statute to require juries to make those findings.  Garcia was tried and sentenced under the new statute.

these arguments fail.  Garcia did not exhaust an independent claim that appellate counsel was ineffective for failing to raise an *ex post facto* claim.  *Carpenter*, 529 U.S. at 453; *Carrier*, 477 U.S. 489–90.  *Martinez* applies only to claims of ineffective assistance of trial counsel.  *Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177.

The claim also lacks merit.  The *ex post facto* doctrine is not implicated because the amendments to Arizona's death penalty statute were procedural rather than substantive in nature and did not retroactively change the penalty for first-degree murder.  *See Summerlin v. Schriro*, 542 U.S. 348, 353 (2004); *McGill*, 16 F.4th at 699–706 (citing *Collins v. Youngblood*, 497 U.S. 37 (1990), and *Dobbert v. Florida*, 432 U.S. 282 (1977)).  Claim 17 is denied.

**Claim 18:**

Garcia alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court permitted the introduction of victim-impact evidence. (Doc. 22 at 174.)  Garcia raised this claim "to avoid preclusion" in his PCR petition.  (PCR Pet. at 68–69.)  The court found it precluded under Rule 32.2(a)(3).  (PCR Ruling at 6–7.)  Garcia argues that the claim's default is excused by the ineffective assistance of appellate and PCR counsel.  (Doc. 22 at 174.)  Again, the Court disagrees.  Garcia did not exhaust an independent claim that appellate counsel performed ineffectively by failing to challenge the victim-impact evidence, *Carpenter*, 529 U.S. at 453, and *Martinez* applies only to claims of ineffective assistance of trial counsel, *Martinez (Ernesto)*, 926 F.3d at 1225.  Claim 18 is denied as procedurally defaulted and barred from federal review.

**Claim 19:**

Garcia alleges that his right to equal protection was violated when the State struck three Hispanic jurors without adequate justification. (Doc. 22 at 179.)  Garcia raised this claim on direct appeal, alleging a violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). (Opening Br. at 30.)  Although the claim cited violations with respect to three jurors, Garcia's argument focused only on Juror R.  (*Id.* at 30–36.)  Likewise, in denying the claim,

1    the Arizona Supreme Court addressed only the allegations involving Juror R.[21]  *Garcia*,

2    234 Ariz. at 10, 226 P.3d at 379.  In his habeas petition Garcia again alleges violations

3    involving three jurors but offers argument only with respect to Juror R.  (Doc. 22 at 183–

4    84.)   As set forth below, there was no *Batson* violation with respect to any of the

5    prospective jurors.

6        Background

7        During jury selection for the aggravation phase of Garcia's trial, the State moved to

8    strike Juror R for cause on the grounds that she could not read English.  (RT 11/29/07,

9    p.m., at 25.)  The court denied the strike, stating that it could accommodate Juror R and she

10   could be a productive juror. (*Id.* at 25–27; RT 12/3/07 at 118–21.)

11       The prosecutor subsequently struck Juror R peremptorily, along with Jurors T and

12   G.  Defense counsel raised a *Batson* challenge.  (RT 12/4/07 at 25.)  In response, the

13   prosecutor offered the following reasons for striking Juror R: she lacked a high school

14   education; she had been at her current job for only a year, indicating a "lack of stability in

15   the community"; before being "rehabilitated" by defense counsel, she had originally

16   indicated that she would have a hard time being fair and impartial because it was a death

17   penalty case; she said she had "a lot of problems understanding what was being said in

18   court" and it was "difficult for her to understand what was going on" because she couldn't

19   read; and she had indicated that serving on the jury would be a problem for her because

20   she was the single mother of five children.  (*Id.* at 28.)

21       With respect to Juror T, the prosecutor first noted that she was not a high school

22   graduate and only had a GED.  (*Id.* at 29.)  Next, the prosecutor pointed out that the juror

23   was not sleeping much because of her dog's seizures and argued that "it's difficult for a

24   juror to sit on a trial of this nature not having a full night of sleep."  (*Id.* at 29.)  The

25   prosecutor also explained that Juror T had previously sat on a hung jury.  (*Id.*)  Finally, the

26   _____

27   [21] In his habeas petition Garcia refers to Juror R (for Maria Rivas) as Juror 33.  (Doc. 22 at
     180–83.)  He refers to the others as Jurors 32 and 84.  (*Id.*)  Respondents refer to them as
28   Jurors T (Debra Torres) and G (Pedro Garcia).  (Doc. 29 at 162–63.)  The Court will use
     the jurors' initials, as does the Arizona Supreme Court.

1   prosecutor questioned the assumption that Juror T was in fact Hispanic, based on her full

2   name and her appearance.[22]  (*Id.*)

3          With respect to Juror G, the prosecutor explained that he had previously sat on a

4   jury that returned a not guilty verdict and the "State does not look at people who have

5   previously given not guilty verdicts.  We don't hold that in high esteem when we're trying

6   to pick a potential juror."  (*Id.* at 31.)  The prosecutor also noted that Juror G had only

7   "some faith" in the criminal justice system; that his initial feelings were that he could only

8   impose the death penalty in extreme circumstances involving mass murder or terrorism;

9   and that he had "concerns about the death penalty" and "generally opposes the death

10  penalty."  (*Id.* at 31–32.)

11         The trial court denied Garcia's *Batson* challenges.  (*Id.* at 32.)  The court explained

12  that "the State has stated race-neutral reasons for the strike and [the court] believes those

13  reasons are reasonable."  (ME 12/4/07 at 2.)  The court also noted that "at least two and

14  possibly three of the jurors who have been chosen appear to have Hispanic sounding

15  names."  (RT 12/4/07 at 34.)

16         <u>Analysis</u>

17         In *Batson*, the Supreme Court held that the Equal Protection Clause forbids a

18  prosecutor from challenging potential jurors based solely on their race.  476 U.S. at 89.

19  Hispanics are a cognizable racial group for *Batson* purposes.  *See Fernandez v. Roe*, 286

20  F.3d 1073, 1077 (9th Cir. 2002).

21         Under *Batson* a defendant's challenge to a peremptory strike requires a three-step

22  analysis.  First, the trial court must determine whether the defendant has made a prima facie

23  showing that the prosecutor exercised a peremptory strike on the basis of race.  *See Rice v.*

24  *Collins*, 546 U.S. 333, 338 (2006).  Second, if the showing is made, the burden shifts to the

25  prosecutor to present a race-neutral explanation for the strike.  *Id.*  Third, the trial court

26  must determine whether the defendant has carried his burden of proving purposeful

27  _____

28  [22] She had given her last name as "Meyers (Torres)."  The judge noted that the juror
    "appears Anglo."  (RT 12/4/07 at 30.)

1    discrimination.  *Id.*

2          At the second step, while the prosecutor must offer a "comprehensible reason" for

3    the strike, *id.*, the reason need not be "persuasive, or even plausible," *Purkett v. Elem*, 514

4    U.S. 765, 768 (1995) (per curiam); *see Mitleider v. Hall*, 391 F.3d 1039, 1050 (9th Cir.

5    2004).  If "the reason is not inherently discriminatory, it suffices."  *Rice*, 546 U.S. at 338;

6    *see Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion).

7          Under the third step, the court must evaluate the persuasiveness of the justification

8    to determine whether the prosecutor engaged in intentional discrimination.  *Purkett*, 514

9    U.S. at 768.  "The opponent of the strike bears the burden of persuasion regarding racial

10   motivation."  *Ayala*, 576 U.S. at 271.  The court need not agree with the prosecutor's stated

11   nonracial reason—the question is not whether the reason represents a sound strategic

12   judgment, but "whether counsel's race-neutral explanation for a peremptory challenge

13   should be believed."  *Hernandez*, 500 U.S. at 365.  "[I]mplausible or fantastic justifications

14   may (and probably will) be found to be pretexts for purposeful discrimination."  *Purkett*,

15   514 U.S. at 768.

16         The Arizona Supreme Court denied Garcia's *Batson* claim.  The court first found

17   that the issue of whether Garcia made a prima facie case of discrimination was "moot"

18   because "[t]he State offered a race-neutral explanation without the trial court making, or

19   the State requesting, an explicit finding on the issue of prima facie discrimination." *Garcia*,

20   224 Ariz. at 10, 226 P.3d at 379 (citing *Hernandez*, 500 U.S. at 359).  The court then found

21   that the State "satisfied the second step of the *Batson* analysis" by "offer[ing] several

22   facially valid, race-neutral explanations for striking Juror R."  *Id.*   Finally, the court

23   addressed the third *Batson* step, which is "fact-intensive" and for which "the trial court's

24   finding . . . is due much deference."  *Id.*  (quotation omitted).  The court explained that it

25   would "not second-guess the trial court's credibility determination, especially when, as

26   here, both parties agree that at least one juror with an Hispanic surname was ultimately

27   chosen."  *Id.*

28

1    Garcia first argues that the court unreasonably applied federal law when it found

2    that the trial court's summary denial of the *Batson* challenge constituted the third step of

3    the *Batson* analysis to which deference was owed.  (Doc. 22 at 182.)  He contends that the

4    trial court never made the required credibility determination with respect to the

5    prosecutor's reasons for striking Juror R, and the Arizona Supreme Court "failed to correct

6    the error on appeal."  (*Id.*)

7    The Court disagrees.   "[F]ederal law has never required explicit fact-findings

8    following a *Batson* challenge, especially where a prima facie case is acknowledged and the

9    prosecution presents specific nondiscriminatory reasons on the record."  *Smulls v. Roper*,

10   535 F.3d 853, 860–61 (8th Cir. 2008); *see McKinney v. Artuz*, 326 F.3d 87, 100 (2d Cir.

11   2003) ("Although reviewing courts might have preferred the trial court to provide express

12   reasons for each credibility determination, no clearly established federal law required the

13   trial court to do so.")  The trial court in Garcia's case determined that the prosecutor "stated

14   race-neutral reasons for the strike" and that "those reasons are reasonable."  (ME 12/4/07.)

15   This represents at least an implicit factual finding regarding the credibility of the

16   prosecutor's proffered race-neutral reasons for the strikes.  *See Messiah v. Duncan*, 435

17   F.3d 186, 198 (2d Cir. 2006) ("As long as a trial judge affords the parties a reasonable

18   opportunity to make their respective records, he may express his *Batson* ruling on the

19   credibility of a proffered race-neutral explanation in the form of a clear rejection or

20   acceptance of a *Batson* challenge."); *see also Charles v. Felker*, 473 F.App'x 541, 543 (9th

21   Cir. 2012) (holding that trial court's *Batson* ruling was an implicit determination of the

22   prosecutor's credibility).

23   Garcia also argues that the court made an unreasonable factual determination when

24   it found that the prosecutor's stated reasons for striking Juror R were race-neutral.  (*Id.*)

25   He contends that the prosecutor's concerns with Juror R's English-language difficulties

26   and low education level were pretextual and not race-neutral.  (Doc. 22 at 183–84.)  In

27   support of these arguments, Garcia asserts that comparative juror analysis shows the

28

- 64 -

1    prosecutor did not challenge two jurors whose educational backgrounds were similar to

2    Juror R's.  (*Id.* at 182–83; *see* Opening Br. at 33.)  These arguments are not persuasive.

3           On habeas review, a petitioner is entitled to relief on a *Batson* claim only if the state

4    court's denial of the claim constituted an unreasonable determination of the facts under

5    § 2254(d)(2).  *See Rice*, 546 U.S. at 338; *Miller-El I*, 537 U.S. at 340.  This Court can grant

6    relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for

7    the *Batson* challenge."  *Rice*, 546 U.S. at 338.  "State-court factual findings . . . are

8    presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and

9    convincing evidence.'"  *Id.* at 338–39 (citing § 2254(e)(1)).  While "[r]easonable minds

10   reviewing the record might disagree about the prosecutor's credibility, . . . on habeas

11   review that does not suffice to supersede the trial court's credibility determination."  *Id.* at

12   341–42.  "A trial court is best situated to evaluate both the words and the demeanor of

13   jurors who are peremptorily challenged, as well as the credibility of the prosecutor who

14   exercised those strikes."  *Ayala*, 135 S. Ct. at 2201; *see Hernandez*, 500 U.S. at 365.

15   Accordingly, "in evaluating habeas petitions premised on a *Batson* violation, 'our standard

16   is doubly deferential: unless the state appellate court was objectively unreasonable in

17   concluding that a trial court's credibility determination was supported by substantial

18   evidence, we must uphold it.'"  *Jamerson v. Runnels*, 713 F.3d 1218, 1225 (9th Cir. 2013)

19   (quoting *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012)); *see Sifuentes v.*

20   *Brazleton*, 825 F.3d 506, 518 (9th Cir. 2016).

21          The Supreme Court and the Ninth Circuit have used comparative juror analysis to

22   assess whether a prosecutor's race-neutral explanation was in fact a pretext for a

23   discriminatory strike.  *See Miller–El II*, 545 U.S. at 241 ("If a prosecutor's proffered reason

24   for striking a black panelist applies just as well to an otherwise-similar nonblack who is

25   permitted to serve, that is evidence tending to prove purposeful discrimination to be

26   considered at *Batson*'s third step."); *see Boyd v. Newland*, 467 F.3d 1139 (9th Cir. 2006);

27   *Kesser v. Cambra*, 465 F.3d 351 (9th Cir. 2006).

28

Applying these principles, Garcia's arguments fall short.  First, English-language proficiency is a valid race-neutral reason for exercising a peremptory strike.  *See Ayala*, 576 U.S. at 278 ("The prosecution had an obvious reason to worry that service on this jury would have strained [the juror's] linguistic capability.");  *Corona v. Almager*, 449 F.App'x 672, 674 (9th Cir. 2011) ("Difficulty with English-speaking ability can be a race-neutral reason to exercise a peremptory strike.") (citing *United States v. Changco*, 1 F.3d 837, 840 (9th Cir. 1993)).  Juror R's difficulty reading English is supported by the record.  (*See* RT 11/29/07, a.m., at 77–78, 83–84.)  Garcia does not contend that the prosecutor's additional reasons for striking Juror R or the other jurors were not race-neutral.

Further, Garcia's comparative juror analysis fails to support his argument.  Garcia does not contend, nor does the record suggest, that the other jurors were unable to read English.  (*See* Doc. 22 at 179–84; Opening Br. at 30–37.)  This reason for striking Juror R does not apply "just as well" to the two non-Hispanic jurors with comparable educational backgrounds.  *Miller–El II*, 545 U.S. at 241.  And Juror R's education level was not the only reason given for the strike.  The prosecutor also cited Juror R's lack of stability in the community, views on the death penalty, and hardship if placed on a jury.  (RT 12/4/07 at 28.)  These additional grounds distinguish Juror R from the two jurors cited by Garcia.  "Comparative analysis therefore supports the justification proffered, as no seated juror possessed the trait that the prosecutor identified as the reason for the strike."  *Jamerson*, 713 F.3d at 1228.

The prosecutor also cited non-pretextual, race-neutral grounds for striking jurors T and G.  For example, Juror T had served on a jury that could not reach a verdict and Juror G had served on a jury that reached a verdict of not guilty.  *See Ngo v. Giurbino*, 651 F.3d 1112, 1116 (9th Cir. 2011) (explaining that strike of juror who had served on three hung juries was race-neutral and not pretextual);  *United States v. Douglas*, 525 F.3d 225, 239–41 (2d Cir. 2008) (accepting prosecutor's explanation that a stricken juror had served on a prior jury that acquitted another criminal defendant).  Garcia does not argue that non-Hispanic jurors with comparable backgrounds served on his jury.  (*See* Doc. 22 at 179–84;

Opening Br. at 30–37.)

Garcia's comparative juror analysis "adds nothing new to the factual equation that the state court already assessed and decided." *Jamerson*, 713 F.3d at 1228.  Deference is still owed to the trial judge's "credibility and factual findings." *Id.*

Finally, as the trial court and the Arizona Supreme Court noted, and as the record shows, the jury ultimately included at least one juror with an Hispanic name.[23]  *See Garcia*, 224 Ariz. at 10, 226 P.3d at 379.  Garcia appears to conceded that an Hispanic juror remained on the jury: "of the possible Hispanic jurors, the court struck two for cause, and the State struck three of the remaining four."  Doc. 22 at 181.[24]  This suggests that the prosecutor's motive was non-discriminatory.  *Sims v. Brown*, 425 F.3d 560, 575 (9th Cir.), *amended*, 430 F.3d 1220 (9th Cir. 2005); *see Turner v. Marshall*, 121 F.3d 1248, 1254 (9th Cir. 1997) (explaining that, while not dispositive, the fact that other African-American jurors remained on the panel may suggest non-discriminatory motive), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999).

In sum, the explanations offered by the prosecutor for striking Jurors R, T, and G were race-neutral and supported by the record.  *See*, *e.g.*, *Mitleider*, 391 F.3d at 1050.  They were not implausible or fantastic.  *Purkett*, 514 U.S. at 768.  Under the doubly deferential standard of review required by *Batson* and § 2254(d)(2), "there is not sufficient evidence to 'supersede the trial court's credibility determination.'"  *Jamerson*, 713 F.3d at 1230 (quoting *Rice*, 546 U.S. at 341–42).  It was not unreasonable for the state courts to credit the prosecutor's explanations.  *Rice*, 546 U.S. at 338.  Claim 19 is therefore denied.

**Claim 20:**

Garcia alleges that because he is not the actual killer, his death sentence amounts to cruel and unusual punishment in violation of the Eighth Amendment.  (Doc. 22 at 184.)

---

[23] Celia Lopez was a juror.  (ROA 359 at 7; *see* RT 12/4/07 at 34, 35.)  Another juror had an Hispanic-sounding first name, Carlos.  (*Id.* at 2.)

[24] Garcia notes that the remaining Hispanic juror was eventually selected as an alternate, but does not suggest that the prosecution had anything to do with the selection of alternates.  Doc. 22 at 181 n.25.

The Arizona Supreme Court denied this claim on appeal. *Garcia*, 224 Ariz. at 19, 226 P.3d at 388. The court explained that *Tison* "explicitly approved the imposition of death sentences on persons who do not themselves kill but who act with reckless indifference to human life and are major participants in criminal activities that result in death." *Id.* (citing *Tison*, 481 U.S. at 158).

Garcia alleges that the court's rejection of this claim was contrary to and an unreasonable application of clearly-established federal law. (Doc. 22 at 185.) He argues that the court failed to consider his individual culpability as an "unarmed accomplice" who "had no role in causing the victim's death" and the disproportionality of his sentence as compared to Sheffield's life sentence. (*Id.*) Garcia also questions the "continued vitality" of *Tison*, arguing that its holding is contrary to recent Eighth Amendment capital decisions, including *Kennedy v. Louisiana*, 554 U.S. 407 (2008). (*Id.*) According to Garcia, under current Supreme Court jurisprudence, the culpability of an unarmed offender who does not intend to kill the victim is insufficient to merit a capital sentence. (*Id.*)

The Arizona Supreme Court reasonably applied both *Tison* and *Kennedy* in rejecting this claim. *Kennedy* did not alter the holding in *Tison*; to the contrary, in a passage cited by the Arizona Supreme Court, 224 Ariz. at 19, 226 P.3d at 388, *Kennedy* confirmed that *Tison* permits the death sentence where defendants "did not themselves kill the victims but their involvement in the events leading up to the murders was active, recklessly indifferent, and substantial."[25]  554 U.S. at 421.

Because *Tison* has not been overruled, there is no clearly-established federal law that would entitle Garcia to relief on this claim. Claim 20 is denied.

**Claim 22:**

Garcia alleges that Arizona's death penalty scheme, as reflected in the penalty-phase jury instructions and verdict forms, impermissibly shifted the burden of proof and created

---

[25] *Tison*'s continuing vitality was demonstrated in *Dickens v. Ryan*, 740 F.3d 1302, 1310–15 (9th Cir. 2014), where the Ninth Circuit, sitting en banc, determined that the Arizona Supreme Court reasonably applied *Tison* in affirming the petitioner's death sentence. *See also Washington v. Ryan*, 840 F.App'x 143, 148 (9th Cir. 2021).

a "presumption of death." (Doc. 22 at 192.)  Arizona law states: "The trier of fact shall impose a sentence of death if the trier of fact finds one or more of the aggravating circumstances . . . and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency." A.R.S. § 13-703(E).  Garcia complains that the instructions and verdict form in his case followed this statute.  Doc. 22 at 194.  The Supreme Court has held, however, that Arizona's death penalty statute is not impermissibly mandatory and does not create a presumption in favor of death. *Walton v. Arizona*, 497 U.S. 639, 651–52 (1990), *overruled on other grounds by Ring II*, 536 U.S. 584; *see Smith*, 140 F.3d at 1272 (rejecting a challenge to the "mandatory" quality of Arizona's death penalty statute).  The Arizona Supreme Court's denial of this claim, *Garcia*, 224 Ariz. at 24, 226 P.3d at 393, was neither contrary to nor an unreasonable application of clearly-established federal law.  Claim 22 is denied.

**Claim 23:**

Garcia alleges that his rights under the Eighth and Fourteenth Amendments were violated by the trial court's "refusal to permit him to argue or the jury to consider whether his death sentence would be proportional to other similarly situated defendants." (Doc. 22 at 195.)  But there is no federal constitutional right to proportionality review of a death sentence. *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) (citing *Pulley v. Harris*, 465 U.S. 37, 43 (1984)); *see Allen*, 395 F.3d at 1018–19.  The Ninth Circuit has explained that the "substantive right to be free from a disproportionate sentence" is protected by the application of "adequately narrowed aggravating circumstance[s]." *Ceja v. Stewart*, 97 F.3d 1246, 1252 (9th Cir. 1996).  The Arizona Supreme Court's denial of this claim, *Garcia*, 224 Ariz. at 24, 226 P.3d at 393, was neither contrary to nor an unreasonable application of clearly-established federal law.  Claim 23 is denied.

**Claim 24:**

Garcia alleges that subjecting him to a "second trial on the issue of aggravation and sentencing before a new jury" violated his rights under the Double Jeopardy Clause. (Doc. 22 at 197.)  Quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949), Garcia argues that

the use of a second jury for sentencing violated his "valued right to have his trial completed by a particular tribunal." (*Id.* at 198.)  The Arizona Supreme Court's denial of this claim, *Garcia*, 224 Ariz. at 23, 226 P.3d at 392, was neither contrary to nor an unreasonable application of clearly-established federal law.

The court relied on its holding in *State v. Ring*, 204 Ariz. 534, 550, 65 P.3d 915, 931 (2003) (*"Ring III"*), which rejected the defendants' arguments under *Wade*. *Id.* *Ring III* cited *Arizona v. Rumsey*, 467 U.S. 203 (1984), *Poland v. Arizona*, 476 U.S. 147 (1986), and *Sattazahn v. Pennsylvania*, 537 U.S. 101, 109 (2003), for the proposition that double jeopardy does not bar a capital defendant from being resentenced to death when he was not "acquitted" of death in the original sentencing. *Ring III*, 204 Ariz. at 551, 65 P.3d at 932. The court also noted that in *Wade* itself the Supreme Court denied a double jeopardy claim where charges were dropped in one military tribunal and reinstituted in another to accommodate witnesses. *Id.* (citing *Wade*, 336 U.S. at 687–88).  The court then reasoned that "[t]he ability to resentence a capital defendant by a different set of jurors is implicit" in *Rumson*, *Poland*, and *Wade*, and therefore rejected the defendants' argument that they were constitutionally entitled to a verdict from a single jury. *Id.*; *cf. Hampton v. Ryan*, No. CV-14-02504-PHX-ROS, 2019 WL 979896, at *24 (D. Ariz. Feb. 28, 2019) ("No clearly established federal law holds that empaneling a second jury for sentencing implicates the Double Jeopardy Clause.").[26]

The Arizona Supreme Court reasonably determined that there was no double jeopardy violation in Garcia's case.  Claim 24 is denied.

**Claim 25:**

Garcia alleges that his rights under the Sixth, Eighth, and Fourteenth Amendments

---

[26] The defendant in *Hampton* was convicted of first-degree murder. *State v. Hampton*, 213 Ariz. 167, 172, 140 P.3d 950, 955 (2006).  Before sentencing could occur, the United States Supreme Court issued its decision in *Ring II*.  Accordingly, a second jury was chosen to hear Hampton's sentencing proceedings.  The Arizona Supreme Court rejected Hampton's double jeopardy argument based on the preference for completing a trial before a single tribunal. *Id.* at 175, 140 P.3d at 958; *see Prince*, 226 Ariz. at 527–28, 250 P.3d at 1156–57 (upholding constitutionality of "trifurcated" jury proceeding).

1    were violated by the trial court's failure to instruct the jury that the State bore the burden

2    of proving its rebuttal to his mitigating evidence beyond a reasonable doubt.  (Doc. 22 at

3    200.)  The Arizona Supreme Court's denial of the claim, *Garcia*, 224 Ariz. at 22, 226 P.3d

4    at 391, was neither contrary to nor an unreasonable application of clearly-established

5    federal law.  The Supreme Court has never set specific standards or methods for balancing

6    aggravating and mitigating factors once the defendant has been found eligible for the death

7    penalty.  *See Marsh*, 548 U.S. at 173, 175; *Franklin*, 487 U.S. at 179; *Stephens*, 462 U.S. at

8    875 n.13.  Claim 25 is denied.

9        **Claim 26:**

10       Garcia alleges that Arizona's jury selection process violates the Sixth, Eighth, and

11   Fourteenth Amendments.  (Doc. 22 at 202.)  He asserts that the "death qualification"

12   process, which excludes jurors whose opposition to capital punishment would prevent or

13   substantially impair the performance of their duties, is unconstitutional.  (*Id.* at 207.)

14   Garcia did not raise this claim in state court.  It is procedurally defaulted and barred from

15   federal review.  *See Carpenter*, 529 U.S. at 453; *Martinez (Ernesto)*, 926 F.3d at 1225.  The

16   claim is also meritless, as it is well established that death qualification does not violate a

17   defendant's right to a fair and impartial jury.  *See Lockhart v. McCree*, 476 U.S. 162, 178

18   (1986); *Witt*, 469 U.S. at 424; *see also Ceja*, 97 F.3d at 1253; *Atwood v. Schriro*, 489

19   F.Supp.2d 982, 1046–47 (D. Ariz. 2007). Claim 26 is denied.

20       **Claim 27:**

21       Garcia alleges that the death penalty is categorically cruel and unusual punishment

22   in violation of the Eighth Amendment.  (Doc. 22 at 213.)  He does not indicate how the

23   Arizona Supreme Court's denial of this claim, *Garcia*, 224 Ariz. at 22, 226 P.3d at 391,

24   conflicts with or unreasonably applies clearly-established federal law.  Supreme Court

25   precedent holds that the death penalty does not constitute cruel and unusual punishment.

26   *See Gregg v. Georgia*, 428 U.S. 153, 169 (1976); *see also Glossip v. Gross*, 576 U.S. 863,

27   881 (2015) ("[W]e have time and again reaffirmed that capital punishment is not per se

28   unconstitutional."); *Roper*, 543 U.S. at 568–69 (noting that the death penalty is

1   constitutional when applied to a narrow category of crimes and offenders).  Claim 27 is

2   denied.

3       **Claim 28:**

4       Garcia alleges that Arizona's pecuniary gain aggravating factor violates the Eighth

5   Amendment because it does not genuinely narrow the class of death-eligible offenders.

6   (Doc. 22 at 216.)  Garcia did not raise this claim in state court.  Its default is not excused

7   by the ineffective assistance of appellate or PCR counsel.  *See Carpenter*, 529 U.S. at

8   453; *Martinez (Ernesto)*, 926 F.3d at 1225.  The claim is also meritless.  The Ninth Circuit

9   has consistently rejected the argument that the pecuniary gain factor fails to narrow the

10  class of death-eligible defendants.  *See Williams v. Stewart*, 441 F.3d 1030, 1059 (9th Cir.

11  2006); *Woratzeck v. Stewart*, 97 F.3d 329, 335 (9th Cir. 1996).  Claim 28 is denied.

12      **Claim 29:**

13      Garcia alleges that the trial court's improper jury instructions limited the mitigation

14  evidence the jury could consider, thereby violating his rights under Eighth and Fourteenth

15  Amendments.  (Doc. 22 at 218.)  Garcia specifically faults the court for instructing the jury

16  that it was not to "be governed or influenced by mere sentiment, passion, or prejudice" in

17  evaluating the mitigating evidence.  The Arizona Supreme Court's denial of this claim,

18  *Garcia*, 224 Ariz. at 23–24, 226 P.3d at 392–93, was neither contrary to nor an

19  unreasonable application of clearly-established federal law.  "[F]ederal courts have

20  consistently held that jury instructions admonishing the jury to base its penalty

21  determination on mitigating or aggravating evidence, not on sympathy for the defendant,

22  pass constitutional muster."  *Mayfield v. Woodford*, 270 F.3d 915, 923 (9th Cir. 2001)

23  (citing *Victor v. Nebraska*, 511 U.S. 1, 13 (1994); *Johnson v. Texas*, 509 U.S. 350, 371–72

24  (1993); *California v. Brown*, 479 U.S. 538, 542–43 (1987)).  Claim 29 is denied.

25      **Claim 30:**

26      Garcia alleges that the reasonable doubt instruction provided by the trial court

27  "diluted and shifted the burden of proof" by using the phrase "firmly convinced," in

28  violation of his rights under the Sixth and Fourteenth Amendments.  (Doc. 22 at 221.)  The

1    Arizona Supreme Court's denial of the claim, *Garcia*, 224 Ariz. at 23–24, 226 P.3d at 392–

2    93, was neither contrary to nor an unreasonable application of clearly-established federal

3    law.

4           "The beyond a reasonable doubt standard is a requirement of due process, but the

5    Constitution neither prohibits trial courts from defining reasonable doubt nor requires them

6    to do so as a matter of course." *Victor*, 511 U.S. at 5.  As long as the jury is instructed that

7    the defendant must be found guilty beyond a reasonable doubt, "the Constitution does not

8    require that any particular form of words be used in advising the jury of the government's

9    burden of proof.  Rather, taken as a whole, the instructions must correctly convey the

10   concept of reasonable doubt to the jury." *Id.*

11          The trial court instructed Garcia's jury as follows:

12          Proof beyond a reasonable doubt is proof that leaves you firmly convinced
            of the defendant's guilt.  There are very few things in this world that we know
13          with absolute certainty and in criminal cases the law does not require proof
            that overcomes every doubt.  If, based on your consideration of the evidence,
14          you are firmly convinced that the defendant is guilty of the crime charged,
            you must find the defendant guilty.  If, on the other hand, you think there is
15          a real possibility that the defendant is not guilty, you must give the defendant
            the benefit of the doubt and find him not guilty.
16

17

18   (ROA 308 at 5–6; RT 11/7/07 at 62–63; *see also* ROA 314 at 5–6; RT 12/13/07 at 14–15.)

19          This instruction, which was consistent with Arizona law, *see State v. Portillo*, 182

20   Ariz. 592, 596, 898 P.2d 970, 974 (1995), is based on the pattern instruction adopted by

21   the Federal Judicial Center.  *See State v. Van Adams*, 194 Ariz. 408, 417–18, 984 P.2d 16,

22   25–26 (1999).  Garcia cites no authority holding that it impermissibly lowers the burden of

23   proof, and in *Victor* Justice Ginsburg praised the instruction as "clear, straightforward, and

24   accurate."   511 U.S. at 26 (Ginsburg, J., concurring).  The Ninth Circuit has upheld

25   identical or substantially similar instructions.  *See, e.g.*, *United States v. Artero*, 121 F.3d

26   1256, 1257–59 (9th Cir. 1997); *United States v. Velasquez*, 980 F.2d 1275 (9th Cir. 1992);

27   *see also Harris v. Bowersox*, 184 F.3d 744, 751–52 (8th Cir. 1999).  Claim 30 is denied.

28   / / /

**Claim 31:**

Garcia alleges that the trial court's failure to require special verdict forms for the jury to indicate its specific findings on mitigating circumstances violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc. 22 at 222.)  The Arizona Supreme Court's denial of this claim, *Garcia*, 224 Ariz. at 23–24, 226 P.3d at 392–93, was neither contrary to nor an unreasonable application of clearly-established federal law.

The Constitution does not require a capital sentencer to document its analysis of mitigating circumstances, as long as the sentencer considers all of the evidence.  *See Jeffries v. Blodgett*, 5 F.3d 1180, 1197 (9th Cir. 1993) ("[D]ue process does not require that the sentencer exhaustively document its analysis of each mitigating factor as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant") (citing *Parker*, 498 U.S. at 314–19; *see also Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (explaining that a defendant is not "entitled to a specific listing and discussion of each piece of mitigating evidence under federal constitutional law").  As noted above, the trial court instructed the jury in Garcia's case to consider all mitigating evidence.

In addition, at the time of Garcia's direct appeal, the Arizona Supreme Court independently reviewed each death sentence to determine the presence or absence of aggravating and mitigating factors and the weight to which the factors were entitled.  *See State v. Gretzler*, 135 Ariz. 42, 54, 659 P.2d 1, 13 (1983).  The court undertook such a review in Garcia's case.  224 Ariz. at 20, 226 P.3d at 389.  Therefore, any error by the trial court in failing to document its consideration of mitigating evidence was cured by the Arizona Supreme Court's review of Garcia's sentence.  Claim 31 is denied.

**Claim 32:**

Garcia alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it requires a defendant to affirmatively prove that the sentencing body should spare his life.  (Doc. 22 at 224.)  The Arizona Supreme Court's

1    denial of the claim, *Garcia*, 224 Ariz. at 23, 226 P.3d at 392, was neither contrary to nor

2    an unreasonable application of clearly-established federal law.  In *Walton*, the Supreme

3    Court held that Arizona's allocation of burdens of proof in a capital sentencing proceeding

4    does not violate the constitution, explaining that "[s]o long as a State's method of allocating

5    the burdens of proof does not lessen the State's burden . . . to prove the existence of

6    aggravating circumstances, a defendant's constitutional rights are not violated by placing

7    on him the burden of proving mitigating circumstances sufficiently substantial to call for

8    leniency."  497 U.S. at 650.  Claim 32 is denied.

9        **Claim 33:**

10       Garcia asserts that his rights under the Fifth, Sixth, Eighth, and Fourteenth

11   Amendments were violated because the aggravating factors were not alleged in the

12   indictment and supported by probable cause.  (Doc. 22 at 225.)  The Arizona Supreme

13   Court's denial of this claim, *Garcia*, 224 Ariz. at 23, 226 P.3d at 392, was neither contrary

14   to nor an unreasonable application of clearly-established federal law.

15       The Supreme Court has held that facts constituting the elements of an offense must

16   be charged in a federal indictment.  *See Jones v. United States*, 526 U.S. 227, 251–52

17   (1999).  But the Fifth Amendment Due Process Clause does not incorporate the same

18   requirement into state criminal prosecutions.  *See Branzburg v. Hayes*, 408 U.S. 665, 688

19   n.25 (1972) (citing *Hurtado v. California*, 110 U.S. 516, 538 (1884)); *see also Gautt v.

20   Lewis*, 489 F.3d 993, 1003 n.10 (9th Cir. 2007).  Because states are not required by the

21   Constitution to empanel grand juries for purposes of indictment, they are not required to

22   specify aggravating factors in an indictment.

23       Garcia contends that *Ring II*, 536 U.S. at 609, and *Apprendi v. New Jersey*, 530 U.S.

24   466, 477 (2000), support his position.  (Doc. 22 at 226.)  But the Supreme Court did not

25   address the issue in either case, let alone hold that aggravating factors must be included in

26   an indictment and subjected to a probable cause determination.  *See Ring II*, 536 U.S. at

27   597 n.4 ("[The Fourteenth Amendment] has not . . . been construed to include the Fifth

28   Amendment right to 'presentment or indictment of a Grand Jury.'") (quoting *Apprendi*,

530 U.S. at 477 n.3).  In *McKaney v. Foreman*, 209 Ariz. 268, 270, 100 P.3d 18, 20 (2004), the Arizona Supreme Court expressly rejected the argument that *Ring* requires aggravating factors to be alleged in an state indictment and supported by probable cause.  Claim 33 is denied.

**Claim 34:**

Garcia alleges that Arizona's capital-sentencing scheme violates the Fifth, Eighth, and Fourteenth Amendments because it denies capital defendants the benefit of proportionality review of their sentences.  (Doc. 22 at 227.)  The Arizona Supreme Court's denial of this claim, *Garcia*, 224 Ariz. at 23, 226 P.3d at 392, was neither contrary to nor an unreasonable application of clearly-established federal law.  As already explained, there is no federal constitutional right to proportionality review. *McCleskey*, 481 U.S. at 306; *Harris*, 465 U.S. at 43.  Claim 34 is denied.

**Claim 35:**

Garcia alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it requires a death sentence whenever one aggravating factor and no mitigating circumstances are found.  (Doc. 22 at 229.)  The Arizona Supreme Court's denial of this claim, *Garcia*, 224 Ariz. at 23, 226 P.3d at 392, was neither contrary to nor an unreasonable application of clearly-established federal law.  The Supreme Court has rejected the claim that Arizona's death penalty statute is impermissibly mandatory. *See Walton,* 497 U.S. at 651–52; *see also Marsh*, 548 U.S. at 173–74.  Claim 35 is denied.

**Claim 36:**

Garcia alleges that Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments because it does not sufficiently channel the sentencer's discretion.  (Doc. 22 at 230.)  The Arizona Supreme Court's denial of this claim, *Garcia*, 224 Ariz. at 23, 226 P.3d at 392, was neither contrary to nor an unreasonable application of clearly-established federal law.

Arizona's death penalty scheme allows only certain statutorily-defined aggravating factors to be considered in determining eligibility for the death penalty.  "The presence of

aggravating circumstances serves the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment does not require that these aggravating circumstances be further refined or weighed by [the sentencer]." *Blystone v. Pennsylvania*, 494 U.S. 299, 306–07 (1990).  Rulings of both the Ninth Circuit and the Supreme Court have upheld Arizona's death penalty statute against allegations that particular aggravating factors do not adequately narrow the sentencer's discretion.  *See Jeffers*, 497 U.S. at 774–77; *Walton*, 497 U.S. at 639, 649–56; *Woratzeck*, 97 F.3d at 335.  Claim 36 is denied.

**Claim 37:**

Garcia alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it does not provide objective standards to guide the sentencer in weighing aggravating factors against mitigating circumstances.  (Doc. 22 at 235.)  The Arizona Supreme Court's denial of this claim, *Garcia*, 224 Ariz. at 23, 226 P.3d at 392, was neither contrary to nor an unreasonable application of clearly-established federal law.

The United States Supreme Court has held that in a capital case "the sentencer may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.'" *Tuilaepa*, 512 U.S. at 979–80 (quoting *Stephens*, 462 U.S. at 875); *see Franklin*, 487 U.S. at 179 (noting that the Court has never held that a specific method for balancing mitigating and aggravating factors is constitutionally required).  Accordingly, a capital sentencer "need not be instructed how to weigh any particular fact in the capital sentencing decision." *Id.* at 979.  Claim 37 is denied.

**Claim 38:**

Garcia alleges that Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments because it affords the prosecutor unbridled discretion to seek the death penalty.  (Doc. 22 at 234.)  The Arizona Supreme Court's denial of this claim, *Garcia*, 224 Ariz. at 23, 226 P.3d at 392, was neither contrary to nor an unreasonable application of clearly-established federal law.

The Supreme Court has held that prosecutors have wide discretion in making the decision whether to seek the death penalty.  *See McCleskey*, 481 U.S. at 296–97; *Gregg*, 428 U.S. at 199 (holding that pre-sentencing decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional).  In *Smith*, the Ninth Circuit rejected the argument that Arizona's death penalty statute is constitutionally infirm because "the prosecutor can decide whether to seek the death penalty."  140 F.3d at 1272; *see Campbell v. Kincheloe*, 829 F.2d 1453, 1465 (9th Cir. 1987).  Claim 38 is denied.

**Claim 39:**

Garcia alleges that Arizona's capital-sentencing scheme discriminates against poor male defendants whose victims are white.  (Doc. 22 at 235.)  The Arizona Supreme Court's denial of this claim, *Garcia*, 224 Ariz. at 23, 226 P.3d at 392, was neither contrary to nor an unreasonable application of clearly-established federal law.

"[A] defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'" and must demonstrate that such discrimination had an effect on him.  *McCleskey*, 481 U.S. at 292 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)).  Therefore, to prevail on this claim, Garcia "must prove that the decisionmakers in his case acted with discriminatory purpose." *Id.*  He does not attempt to meet that burden, offering no evidence specific to his case that would support an inference that sex, race, economic status, or the race of his victim played a part in his sentence.  *See Richmond v. Lewis*, 948 F.2d 1473, 1490–91 (9th Cir. 1990) (holding that statistical evidence that Arizona's death penalty is discriminatorily imposed based on race, sex, and socioeconomic background is insufficient to prove decisionmakers in petitioner's case acted with discriminatory purpose), *vacated on other grounds*, 986 F.2d 1583 (9th Cir. 1993).  Claim 39 is denied.

**Claim 40:**

Garcia alleges that Arizona's capital-sentencing scheme is unconstitutional because it limits full consideration of mitigation by requiring the defendant to prove mitigating

1    circumstances by a preponderance of the evidence and shifts the burden to the defendant

2    to prove that his life should be spared.  (Doc. 22 at 238–40.)  The Arizona Supreme Court's

3    denial of this claim, *Garcia*, 224 Ariz. at 23, 226 P.3d at 392, was neither contrary to nor

4    an unreasonable application of clearly-established federal law.  Again, the Supreme Court

5    has rejected the claim that Arizona's death penalty statute is impermissibly mandatory and

6    creates a presumption in favor of the death penalty.  *Walton*, 497 U.S. at 651–52; *see Smith*,

7    140 F.3d at 1272.  Claim 40 is denied.

8           **Claim 41:**

9           Garcia alleges that the instruction requiring the jury to unanimously determine that

10   the mitigating circumstances were "sufficiently substantial to call for leniency" violated

11   the Eighth Amendment.  (Doc. 22 at 241.)  The Arizona Supreme Court's denial of this

12   claim, *Garcia*, 224 Ariz. at 24, 226 P.3d at 393, was neither contrary to nor an unreasonable

13   application of clearly-established federal law.  *See Walton*, 497 U.S. at 651–52.  Garcia's

14   argument that the unanimity requirement impermissibly limited the jury's consideration of

15   mitigating evidence fails because unanimity was not required with respect to individual

16   mitigating circumstances.  *See Ellison*, 213 Ariz. at 139, 140 P.3d at 922 (citing *Mills v.*

17   *Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990)).

18   Instead, the jury was properly instructed that unanimity was required only with respect to

19   the verdict.  *See*, *e.g.*, *Howard v. Gittere*, 392 F.Supp.3d 1205, 1223 (D. Nev. 2019).  Claim

20   41 is denied.

21          **Claim 42:**

22          Garcia alleges that the failure to instruct the jury that only murders that are "above

23   the norm" may qualify for the death penalty violated the Sixth, Eighth, and Fourteenth

24   Amendments.  (Doc. 22 at 243.)  The Arizona Supreme Court's denial of this claim,

25   *Garcia*, 224 Ariz. at 24, 226 P.3d at 393, was neither contrary to nor an unreasonable

26   application of clearly-established federal law.  The Supreme Court has never held that such

27   an instruction is required to narrow the class of defendants eligible for the death penalty,

28   which instead is accomplished through the use of statutory aggravating factors.  *See*

1   *Jeffers*, 497 U.S. at 774–77; *Walton*, 497 U.S. at 649–56; *Blystone*, 494 U.S. at 306–07;

2   *see also State v. Bocharski*, 218 Ariz. 476, 488, 189 P.3d 403, 415 (2008) (explaining that

3   the class of persons to whom the death penalty applies was narrowed by jury's finding of

4   two aggravating factors, "making an above the norm instruction unnecessary").  Claim 42

5   is denied.

6          **Claim 43:**

7          Garcia alleges that the refusal to permit voir dire of prospective jurors regarding

8   their views on specific aggravating and mitigating circumstances violated his rights under

9   the Sixth and Fourteenth Amendments.  (Doc. 22 at 246.)  The Arizona Supreme Court's

10  denial of this claim, *Garcia*, 224 Ariz. at 24, 226 P.3d at 393, was neither contrary to nor

11  an unreasonable application of clearly-established federal law.   Contrary to Garcia's

12  argument, *Witherspoon*, *Witt*, and *Morgan* "do[] not compel a trial court to allow questions

13  about how a potential juror would vote if given specific examples of aggravating or

14  mitigating evidence."  *Hodges v. Colson*, 727 F.3d 517, 528 (6th Cir. 2013); *see Richmond*

15  *v. Polk*, 375 F.3d 309, 329–30 (4th Cir. 2004); *Trevino v. Johnson*, 168 F.3d 173, 183 (5th

16  Cir. 1999); *United States v. McVeigh*, 153 F.3d 1166, 1207 (10th Cir. 1998); *see also Smith*

17  *v. Ryan*, No. CV-12-00318-PHX-PGR, 2014 WL 1247828, at *27 (D. Ariz. Mar. 24, 2014),

18  *aff'd*, 823 F.3d 1270 (9th Cir. 2016).  Claim 43 is denied.

19         **Claim 44:**

20         Garcia alleges that the death penalty violates his due process rights because it is

21  irrationally and arbitrarily imposed and serves no purpose that is not adequately addressed

22  by life in prison.  (Doc. 22 at 248.)  The Arizona Supreme Court's denial of this claim,

23  *Garcia*, 224 Ariz. at 24, 226 P.3d at 393, was neither contrary to nor an unreasonable

24  application of clearly-established federal law.  *See Walton*, 497 U.S. at 655–56; *Smith*, 140

25  F.3d at 1272; *see also Andriano*, No. CV-16-01159-PHX-SRB, 2021 WL 184546, at *81

26  (D. Ariz. Jan. 19, 2021); *Roseberry v. Ryan*, No. 15-CV-1507-PHX-NVW, 2019 WL

27  3556932 at *37 (D. Ariz. August 5, 2019).  Garcia "simply fails to provide any clearly

28

1   established authority in support of his contention." *Roybal*, 148 F.Supp.3d at 1111.  Claim

2   44 is denied.

3        **Claim 45:**

4        Garcia alleges that his right to be free from cruel and unusual punishment would be

5   violated if the State executed him after he spent nearly fifteen years in jail and on death

6   row.  (Doc. 22 at 249.)  This claim is meritless.

7        "The Supreme Court has never held that execution after a long tenure on death row

8   is cruel and unusual punishment." *Allen v. Ornoski*, 435 F.3d 946, 958 (9th Cir. 2006); *see*

9   *Lackey v. Texas*, 514 U.S. 1045 (1995) (mem.) (Stevens, J. & Breyer, J., discussing denial

10  of certiorari and noting the claim has not been addressed); *Thompson v. McNeil*, 556 U.S.

11  1114 (2009) (mem.) (Stevens, J. & Breyer, J., dissenting from denial of certiorari; Thomas,

12  J., concurring, discussing *Lackey* issue); *see also Knight v. Florida*, 528 U.S. 990 (1999)

13  (Thomas, J., concurring in denial of certiorari) ("I am unaware of any support in the

14  American constitutional tradition or in this Court's precedent for the proposition that a

15  defendant can avail himself of the panoply of appellate and collateral procedures and then

16  complain when his execution is delayed.").

17       Circuit courts have consistently held that prolonged incarceration under a sentence

18  of death does not violate the Eighth Amendment.  *See McKenzie v. Day*, 57 F.3d 1493,

19  1493–94 (9th Cir. 1995) (en banc); *White v. Johnson*, 79 F.3d 432, 438 (5th Cir. 1996);

20  *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir. 1995). Claim 45 is denied.

21       **Claim 46:**

22       Garcia alleges that execution by lethal injection as carried out in Arizona constitutes

23  cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

24  (Doc. 22 at 259.)  Garcia does not explain how the Arizona Supreme Court's denial of this

25  claim, *Garcia*, 224 Ariz. at 23, 226 P.3d at 392, was contrary to or an unreasonable

26  application of clearly-established federal law.  *See*, *e.g.*, *Baze v. Rees*, 553 U.S. 35 (2008).

27  Moreover, the Ninth Circuit has concluded that Arizona's lethal injection protocol does not

28  violate the Eighth Amendment.  *Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011).

1    In addition, prior to execution, Garcia may present this claim in a separate civil

2    rights action under 42 U.S.C. § 1983.  *See Hill v. McDonough*, 547 U.S. 573, 579–80,

3    (2006) (recognizing that a challenge to the State's execution method may be brought in a

4    § 1983 action).  Claim 46 is denied.

5          **Claim 47:**

6          Garcia alleges that he will be denied a fair clemency process in violation of the

7    Eighth and Fourteenth Amendments.  (Doc. 22 at 266.)  This claim is not cognizable on

8    federal habeas review.  Habeas relief may only be granted on claims that a prisoner "is in

9    custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.

10   § 2254(a).  Garcia's challenge to state clemency procedures and proceedings does not

11   represent an attack on his detention and thus does not constitute a proper basis for relief.

12   *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam); *see also Woratzeck*

13   *v. Stewart*, 118 F.3d 648, 653 (1997).  Claim 47 is denied.

14         **Claim 48:**

15         In his final habeas claim, Garcia alleges that his conviction and sentence must be

16   vacated due to the cumulative prejudicial effect of the errors in this case.  (Doc. 22 at 267.)

17         The United States Supreme Court has not specifically recognized the doctrine of

18   cumulative error as an independent basis for habeas relief.  *See Lorraine v. Coyle*, 291 F.3d

19   416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional

20   claims can be cumulated to grant habeas relief."); *cf. Morris v. Sec'y Dep't of Corr.,* 677

21   F.3d 1117, 1132 n.3 (11th Cir. 2012) (refusing to decide whether "under the current state

22   of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA

23   can ever succeed in showing that the state court's decision on the merits was contrary to or

24   an unreasonable application of clearly established law").

25         The Ninth Circuit has held that in some cases, although no single trial error is

26   sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may

27   nonetheless prejudice a defendant to such a degree that his conviction must be overturned.

28   *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002), *overruled on other grounds*

*by Slack v. McDaniel*, 529 U.S. 473 (2000).  Here, however, the Court has not identified any constitutional errors arising during the guilt phase of Garcia's trial.  Therefore, "[b]ecause there is no single constitutional error in this case, there is nothing to accumulate to [the] level of a constitutional violation."  *Id.*; *see Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005); *Morris*, 677 F.3d at 1132 & n.3.

Because Supreme Court precedent does not recognize the doctrine of cumulative error, and because this Court has determined that no prejudice resulted from the errors alleged by Garcia, the claim of cumulative prejudice lacks merit.  Claim 48 is denied.

## IV.    CERTIFICATE OF APPEALABILITY

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, a petitioner cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer.  Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further."  *Slack*, 529 U.S. at 484.  For procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct.  *Id.*

The Court finds that reasonable jurists could debate its resolution of Claim 1(A), alleging that counsel performed ineffectively at sentencing by failing to investigate and present mitigating evidence.

**IT IS ORDERED** that Garcia's Petition for Writ of Habeas Corpus (Doc. 22) is **DENIED**.  The Clerk of Court shall enter judgment accordingly.

1

2

**IT IS FURTHER ORDERED** granting a certificate of appealability with respect to Claim 1(A).

3

4

**IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

5

6

Dated this 20th day of April, 2022.

7

8

9

10

David G. Campbell
Senior United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28